**EMBRY–RIDDLE AERONAUTICAL UNIVERSITY, Plaintiff-Appellee,**

v.

**ROSS AVIATION, INC., et al., Defendants,**

**Local 2003 of the International Association of Machinists and Aerospace Workers, Defendant-Appellant.**

No. 73–1842.

United States Court of Appeals, Fifth Circuit.

Dec. 2, 1974.

897

Guy Sparks, Anniston, Ala., for Local 2003.

Kenneth T. Fuller, Joe C. Cassady, Enterprise, Ala., for Ross Aviation.

Philip H. Elliott, Jr., Daytona Beach, Fla., Albert W. Copeland, Montgomery, Ala., for plaintiff-appellee.

Before GODBOLD, SIMPSON and INGRAHAM, Circuit Judges.

GODBOLD, Circuit Judge.

Embry-Riddle Aeronautical University ["Embry"], the appellee, sued Ross Aviation Corporation ["Ross"], its board chairman and president Joe Ross, and Local 2003, International Association of Machinists and Aerospace Workers, for violation of section 1 of the Sherman Act, 15 U.S.C. § 1.[1] Embry won a $40,000 verdict based upon answers of a jury to numerous written interrogatories. The court entered judgment for the trebled amount of $120,000 plus attorney fees. Only Local 2003 appeals, making three arguments: (1) it was within the "labor union exemption" from antitrust liability; (2) even if no exemption applied, there was insufficient evidence to make out a Sherman One violation; (3) the District Court should have informed the jury that any award it assessed would be tripled under 15 U.S.C. § 15. We affirm.

### 1. The facts.

Ross, a publicly held company engaged in performing contracts for military and governmental agencies, trained Army pi-

---

1. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. . . ."

lots at Fort Rucker, Alabama, under contract with the Army beginning in 1962. The contract was re-awarded to Ross several times. It was due to expire again June 30, 1970, and several months earlier the Army solicited bids for a new contract. Ross bid but Embry was low bidder, and June 5, 1970 the Army announced it had awarded the new contract to Embry. The essence of appellee's Sherman One claim is that Ross and the local conspired to deprive Embry of the benefits of its contract with the Army by making it impossible for Embry to perform. Considerable of the evidence is in conflict. Under familiar standards, there was sufficient evidence on the basis of which the jury could conclude that the factual history was as follows. Necessarily the recital is detailed.

Union activity began among Ross' Fort Rucker employees soon after the company commenced performance of its contract in the early 1960's. From then until shortly after the Army's June 5, 1970 announcement Ross uniformly resisted unionism. In 1963 the appellant local demanded recognition as bargaining agent for two groups of employees. Ross refused recognition, the NLRB ordered an election, and the union won with respect to flight instructors but lost with respect to clerical and maintenance workers. The local represented the flight instructors until 1967 when the program in which they worked was transferred to another base. In 1968 recognition was demanded by the employees of a different training division of Ross, including fixed wing flight instructors. Ross refused and a seven week recognition strike ensued. A Board election was ordered, and the union lost by one vote.

April 27, 1970 the union again demanded recognition on behalf of employees of the same division [fixed wing] as had demanded recognition in 1968, and on or about the same date filed a petition with the NLRB for an election. Ross declined recognition. At some time prior to June 5 Ross consent-ed to an election which the NLRB scheduled for July 2.

May 20 Ross sent a letter to all employees saying, in part:

We are thus again in a campaign caused by actions of the same union as before who have selfish and personal gain in mind and who are trying to attract your interest—your interest with idle promises. Over the next few weeks we shall continue to communicate with you whereby all of you may factually know the issues involved in this campaign. The company has confidence that you will make the right decision in the coming election and vote for yourself by voting no to unionization—unionism. The right decision will enable us to continue to work together as a team for the mutual benefit of all of us.

The Army made its announcement of contract award on June 5. It was expected by Embry, the Army, Ross, and Ross' employees that Embry would employ all or most of the Ross employees, as Ross had done with respect to the work force of its predecessor when it took over in 1962. After the announcement and during the rest of June the employees were anxious about their jobs and their salary levels, and some were frustrated about what they considered slowness by Embry in recruiting them for employment.

June 8 Ross filed with the Army a formal protest of the award.

A special meeting of the local was held June 10, and a representation committee was elected and directed to seek immediate recognition from Ross by card check and also to seek contract negotiations that must conclude by June 21. June 12 the bargaining committee met with President Joe Ross, hand-carrying a written demand for recognition. The committee, on threat of strike, demanded card check recognition, immediate salary increases of $200-250 a month as evidence of management good faith, and immediate collective bargain-

ing. In 1963 or 1964, in 1968, and a month and a half earlier (around May 1), Ross had refused card count recognition. In this instance, on the same day and occasion that the demand was received Mr. Ross consented in writing to a card count and agreed to $100 a month raise for flight instructors and somewhat less for other employees in the fixed wing division, effective June 15. The card count was held June 15 and revealed signed cards for 85%-90% of employees affected. Ross immediately recognized the union as bargaining agent for fixed wing employees.

Meanwhile the previously unorganized rotary wing [i. e., helicopter] employees had begun to organize and had sought assistance from the local. June 11 they held a meeting, chose a representation committee, and directed it to seek card check recognition. The same day the local informed Mr. Ross of what the rotary wing employees were doing and predicted that he would receive a letter from them demanding recognition. June 16 the rotary wing committee met with officials from the local. A demand for card count recognition and bargaining was drafted, the committee and officer(s) from the local presented it to Mr. Ross, he agreed to a count, the count was held, a majority of approximately 75% was shown, and Ross extended recognition, all on June 16. Also, by June 16 Ross had in hand a proposed contract from the union and was studying it.

The two units contained approximately 435 employees. Commencing after Ross had recognized the two bargaining committees and had agreed to immediate bargaining and immediate salary increases, President Ross made a series of speeches to more than 400 affected employees. The speeches were variously placed as having occurred in a time span of June 16–21. Numerous witnesses described what Mr. Ross said and what the company contemporaneously did. We re-iterate that the evidence conflicted and that we set out what the jury could find was said and done. Mr. Ross stated it was a "dirty shame" that the employees would have their pay reduced. He told them that he had "heard" that a union was being formed. He said that previously he had actively fought the union but that it was now time to change his position, that he thought it was in the best interests of the employees to join the union and he recommended that they do so. If the union organized quickly enough Embry could be forced to default on its contract. If the union, when organized, made demands he would accept them and would enter into a contract that would be binding on Embry and would contain terms that Embry, under the provisions of its low bid, would be unable to comply with so that it would have to default. Or, upon inability of Embry to perform there would be a strike, and Embry would then be put in default for inability to perform. When Embry defaulted, Ross, as second low bidder, would take over the contract under the terms of its bid, and it could meet the terms and conditions previously agreed upon with the union. Employees would not lose either pay or seniority, and the pay scale would remain the same as agreed to by Ross [on June 15].

Before and after these meetings, and in some instances during the meetings, Ross middle management personnel passed out, and had others pass out, employment applications to be filled out and signed by employees, covering the same positions that they then held with Ross. Employees were told to leave blank the date and the salary. Some understood that the applications were to be effective if and when Embry defaulted. In some instances employees were ordered rather than requested to sign the forms.[2] Forms were given to some employees who already had applied to Embry for employment and to some who already had entered into contracts with

2. One pilot who objected to signing with date and salary blank was told to sign or he wouldn't fly any more, and his superior, who gave him the form, said his orders were that everyone must sign the forms prior to departing for flights.

Embry. Numerous employees signed the application forms.

Both before and after the meetings at which Mr. Ross spoke the union continued to distribute membership cards. After he had heard one of the speeches by Mr. Ross, a flight instructor not a part of management was solicited for union membership by a nonmanagement employee who told him: "This is the man, you heard the word, this is do or die. . . . You better sign the thing; we need it." Another flight instructor told the same person: "Well, you better sign this card. We got to have a hundred percent; if we get a hundred percent, we got them wired." The flight instructor receiving these entreaties told "the rest of the guys" this: "How can you have [a] union represent you when you have already signed a contract with Embry-Riddle?"

Face to face contract negotiations between Ross and the union began around June 18 to 20 and continued to around June 25. Separate contracts were agreed upon with the fixed wing and rotary wing employees, approved in membership meetings of the two units, printed, and then executed between June 25 and 30 (various witnesses testified to various dates within this span). The contracts provided for increased salaries and benefits.[3] Ross' vice president, who negotiated with the union, testified that he had no idea what these increases would cost Ross if it were operating under the collective bargaining agreement, that probably Ross would have lost money or broken even. Extrapolating from this conclusion, he estimated that the total additional cost was approximately $325,000 annually. Though the contract was executed before July 1, the effective date of the increases in salary and benefits was July 1, the first day of Embry's contract with the Army. Both bargaining contracts contained successorship clauses.

Under its contract Ross was required to cooperate with Embry as successor contractor in effecting a smooth transition to the end that the training program not be interrupted. Obviously, the events since June 5, culminating in contracts purporting to bind a successor, were significant events to be communicated to Embry under the requirement of transitional cooperation, but Ross gave no notice to Embry of what was occurring despite the fact that the two companies were in communication with each other. In late June, Ross gave the Army copies of the contracts but sent none to Embry. In other respects as well Ross did not cooperate in the transitional process, and finally toward the end of June Embry protested to the Army concerning the lack of cooperation.

The union made no suggestion that Embry be brought into the collective bargaining sessions, although it knew that Embry was to take over July 1. The man who had been the professional representative of the international union in the Fort Rucker area for a number of years, and had played the leading role in efforts to organize Ross, and had represented the union in the contract negotiations, testified that his union customarily sought successorship clauses, but that he had never before negotiated or even known of a contract negotiated with an existent employer to become effective when a successor employer was to take over.

There was evidence that during June a facade of anti-unionism was sought. Ross did not inform middle management of its departure from its prior policies with regard to unionism. Instead at least some members of middle management were advised to resist the union and to discourage employees from joining. On the union side, there was testimony that some union members were never informed that contracts had been negotiated.

July 1 Embry began to perform, using more than 400 employees with whom it had made contracts, most of them form-

---

3. Vacation, life insurance, and sick leave.

er Ross employees, some of whom were employed at the same salary previously paid by Ross, others at lesser salaries. July 2 the union approached Embry for the first time and delivered a letter stating:

The International Association of Machinists and Aerospace Workers is the collective bargaining agent for two separate bargaining units of your employees. The two units are your fixed wing instruction and rotary wing instruction employees which are presently covered by labor management agreements. *We request and demand the terms and conditions contained in the enclosed agreements be effective on July 1, 1970, and continued for the durations of said agreements.* (emphasis added.)

Embry's work force was sufficient, and it satisfactorily performed the training contract until struck. Embry refused to recognize the local as bargaining agent and stated it was not bound by the contracts signed with Ross, that it considered them not entered into through good faith bargaining and in violation of the National Labor Relations Act. The union instituted proceedings before the NLRB on July 12, and a day or two later about 325 employees went out on strike. Embry tried to continue training operations with a handful of employees but without success. During the time that picket lines were set up Ross personnel encouraged Embry-employed flight instructors not to go to work. July 16 the Army notified Embry the contract would be terminated unless performed. The same day Embry asked the Army whether the contract could be renegotiated to increase salaries as demanded by the employees, and the Army replied in the negative. Ross wrote the Commanding General of Fort Rucker on July 21, offering its services if Embry were terminated and stating that it could take over on 12 hours notice as early as July 25. The same day it wrote the Assistant Secretary of the Army that the Army "made a serious mistake by selecting a contractor with-

out enough money in his bid even to pay the then existing wage scales, much less the union demanded wage scales."

Mediation was attempted between Embry and the union. July 26 union membership rejected suggested settlement proposals on the grounds, it said, that funds available under Embry's contract with the Army had resulted in lower salaries for some employees and would not permit continuation of group insurance, and, additionally, "it [presumably the overall situation or the Embry contract] was full of impossibilities or unknowns." The strike was not settled, and on July 26 the Army declared Embry in default and began using military personnel to train pilots.

## 2. Exemption.

■ The labor union exemption from the operation of the antitrust laws arises out of, *inter alia*, 29 U.S.C. §§ 52, 101, 102, and 105, 151. See generally United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941); Allen Bradley Co. v. Local 3, IBEW, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), and cases cited therein. The Supreme Court has made clear that unions do not enjoy absolute immunity. The exemption is generally said to be forfeited when the union joins with a nonlabor group in a scheme prohibited by the antitrust laws. In two important cases the Court has particularized this rule. In *Allen Bradley, supra,* one union represented both the employees of New York City electrical equipment manufacturers and the employees of contractors in the business of installing electrical equipment, who were the manufacturers' chief local customers. Through conventional labor union methods the union made closed shop collective bargaining agreements with the contractors which provided that the contractors would buy equipment only from local manufacturers who also had closed shop agreements with the union. The manufacturers agreed with the union to confine their New York City sales to contractors employing union members. As a result the

New York City market was completely closed to outside manufacturers because no in-city contractors would buy from them. In-city prices and wages rose steeply. The Supreme Court found no antitrust exemption, holding that

> when the unions participated with a combination of business men who had complete power to eliminate all competition among themselves and to prevent all competition from others, a situation was created not included within the exemptions of the Clayton and Norris-La Guardia Acts.

325 U.S. at 809, 65 S.Ct. at 1540, 89 L. Ed. at 1948.

A second situation in which the exemption may be forfeited was discussed in UMW v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). The plaintiff, a small coal operator, alleged that the large coal operators and the UMW had conspired to squeeze him out of business. Underlying the conspiracy, he claimed, was an understanding between the union and the large operators that production should be limited and mechanization encouraged. The number of jobs would shrink, but the workers who were left would get better wages, benefits, and conditions.

To effect the alleged scheme, plaintiff claimed, the union and the large operators had agreed to certain wages and hours and had agreed that the union would force the same terms upon small operators whose employees it also represented, though in separate bargaining units. For reasons of economies of scale it was harder for the small operators than for the large ones to pay the new rates, and small operators like plaintiff lost profits or had to fold entirely. The Supreme Court held that

> a union forfeits its exemption from the antitrust laws when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on other bargaining units. One group of employers may not conspire to eliminate competitors from the industry and the union is liable with the

employers if it becomes a party to the conspiracy. This is true even though the union's part in the scheme is an undertaking to secure the same wages, hours or other conditions of employment from the remaining employers in the industry.

381 U.S. at 665–666, 85 S.Ct. at 1591, 14 L.Ed.2d at 633–634. The Court noted that nothing in the labor policy conflicted with its conclusion. Indeed, labor policy was clearly set against the alleged scheme, because to effectuate it the union, as bargaining agent for some units, obligated itself to take an inflexible position when negotiating on behalf of other units. The upshot was an undesirable restriction upon the freedom of those other units to recede and make compromise agreements with their respective employers.

■ The present case is closer to the *Pennington* than to the *Allen Bradley* model. There are, however, several divergences which the union elaborates into arguments favoring exemption. First, the *Pennington* court spoke in terms of an employer group, whereas here only Ross, a single business entity, is alleged to have conspired with the union. We hold that this makes no difference. *Pennington* would not have come out the other way if a single large coal operator rather than a group of operators had been accused of conspiring with the UMW. Secondly, Local 2003 emphasizes that there was no "other" bargaining unit whose bargaining freedom was restricted but only one unit which in the immediate future would be employed by a new and successor employer. But nonexemption can be found despite this difference. Three factors guide us to this conclusion. First, we read Part I of *Pennington* as focusing primarily on the antitrust statutes, antitrust cases, and the particular Code provisions from which courts spin out the labor union exemption. Then, beginning with the first full paragraph following footnote 2, the Court tested the nonexemption conclusion that it had already reached against general labor policy as distinct

from specific provisions. The Court found the conclusion sound, reasoning that labor law not only did not support the UMW's alleged conduct but actually was set against it. Second, in *Allen Bradley* nonexemption was found although no restriction upon other units represented by the conspiring union was involved. Finally, in Local Union No. 189, Amalgamated Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965), a companion case to *Pennington*, Justice White passed over the fact of no restrictive effect on other units and based his exemption finding on lack of claimed conspiracy. See, 79 Harv.L.Rev., The Supreme Court, 1964 Term, 56, n. 11 (1965).

Also, *Pennington* expressed its "other bargaining units" concept in varying ways and one of the verbal formulas employed encompasses the present fact situation. Justice White wrote:

> Prior to the agreement the union might seek uniform standards in its own self-interest but would be required to assess in each case the probable costs and gains of a strike or other collective action to that end and thus might conclude that the objective of uniform standards should temporarily give way. After the agreement the union's interest would be bound in each case to that of the favored employer group.

381 U.S. at 668, 85 S.Ct. at 1592, 14 L. Ed.2d at 635. Within the framework of the alleged scheme, Local 2003's interests after appellee began performance of the new contract remained bound to those of Ross, the "favored employer."

■ At least in cases falling within the *Pennington* model, for nonexemption and liability to be found the union must be proved to have had a purpose to injure or eliminate the competitor of a company whose employees it represents. *See, e. g.,* Bodine Produce, Inc., v. United Farm Workers, 494 F.2d 531 (CA9 1974). A rule of law requiring a lower level of intent than purpose would open the way to disastrous incursions upon Congressionally-sanctified areas of labor union activity. When a union imposes a collective bargaining agreement upon Company X, it will always advantage X by forcing the same agreement on competitor Company Y which theretofore offered less advantageous terms and working conditions. This is a fact of commercial life known to all unions. But if possession of that knowledge should mean that the union had to tread warily in negotiating with Y, refraining from striking, for example, or from taking a rigid bargaining stance for fear of losing the antitrust exemption, labor policy would be stood on its head. See generally the opinion of Justice Goldberg in *Jewel Tea, supra,* 381 U.S. at 697–735, 85 S.Ct. 1596, 14 L.Ed.2d at 654–676. Antitrust suits could become employers' routine response to union contract demands, possibly coupled with claims for injunctions against strikes or against union adherence to particular bargaining positions.

■ Union purpose to conspire is necessary, as we have said, but that purpose alone is not sufficient. A union can, without forfeiting the exemption or substantively transgressing the antitrust laws, act with a purpose to injure or even eliminate the business of an employer, no matter whether it does so because it more or less legitimately defines its interests in terms of injuring the employer[4] or because of personal animus toward a particular employer, see Hunt v. Crumboch, 325 U.S. 821, 65 S.Ct. 1545, 89 L.Ed. 1954 (1945).[5] What makes the exemption disappear is suffi-

---

4. As where it decides that fewer jobs but higher paying jobs will be better for it in the long run.

5. Justice White wrote in *Pennington* that "[u]nilaterally, and without agreement with any employer group to do so, a union may adopt a uniform wage policy and seek vigorously to implement it . . . . " 381 U. S. at 665 n. 2, 85 S.Ct. at 1591, 14 L.Ed.2d at 633 n. 2.

cient proof of *concerted* purpose, between the union and a favored employer.

The District Court in the present case, without objection, instructed the jury on the requirement of concerted purpose, saying,

> Embry-Riddle further contends in this case that after it was publicly announced that this contract would be let to Embry-Riddle and not to Ross, that Ross Aviation and the International Association of Machinists and possibly others entered into a combination or a conspiracy in violation of the antitrust laws of the United States, under the terms of which the defendants conspired to make it impossible for Embry-Riddle to perform its contract for flight training with the Army.

In effect the court placed the exemption issue and the issue of liability on the merits before the jury under one instruction. Perhaps the preferable practice would be to separate them. *See* Ramsey v. UMW, 401 U.S. 302, 314, 91 S.Ct. 658, 28 L.Ed.2d 64, 73 (1971), in which Justice Douglas in a dissenting opinion stressed their separability, citing Apex Hosiery Co. v. Leader, 310 U. S. 469, 512, 60 S.Ct. 982, 84 L.Ed. 1311, 1333 (1940). *See also* Cedar Crest Hats, Inc. v. United Hatters, 362 F.2d 322 (CA5 1966).[6]

■ There was sufficient evidence to present a jury issue on nonexemption. *Pennington* clearly contemplated that indirect evidence could suffice. See 381 U.S. at 665 n. 2, 85 S.Ct. 1585, 14 L.Ed. 2d at 633 n. 2. We have described the content of Mr. Ross' speeches, made to almost all of the employees affected. Union majorities from the two card counts were 75% to 90%. Necessarily Mr. Ross' audiences were largely composed of the persons who *were* the local union. He explicitly revealed his purpose to use increased benefits to union

---

**6.** In *Ramsey* the majority opinion rejected the idea that § 6 of the Norris-La Guardia Act, 29 U.S.C. § 106, required "clear proof" rather than. merely proof by a preponderance of the evidence in civil antitrust cases against unions. In dissent Justice Douglas strove to narrow the majority holding by stating that it concerned the liability issue only. Thus, Justice Douglas implied that the question of the correct evidentiary standard for deciding the exemption issue remained open. It is not clear to us that this is true. The District Court, Ramsey v. UMW, 265 F.Supp. 388 (E.D.Tenn.1967), came down in favor of the clear proof standard and the Sixth Circuit affirmed by an equally divided court, Ramsey v. UMW, 416 F.2d 655 (CA6 1969). As we read the District Court opinion, the trial judge was considering the standard for weighing evidence of exemption.

> "Having concluded that the Protective Wage Clause does not constitute an express commitment upon the part of the U.M.W. to the B.C.O.A. not to bargain with any other coal operator upon any terms other than the national contract, this does not conclude the issue of whether the U.M.W. did in fact, though not expressly, so contract with the B.C.O.A. Were this case being tried upon the usual preponderance of the evidence rule applicable to civil cases, the Court would conclude that the U.M.W. did so impliedly agree. However, the standard of proof where a labor union is involved is 'clear proof', as required by Section 6 of the Norris-La Guardia Act, a standard different from the ordinary civil burden of persuasion. United Brotherhood of Carpenters v. United States, 330 U.S. 395, 67 S. Ct. 775, 91 L.Ed. 973; United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218. The Court is of the opinion that the evidence upon the record in this case does not establish such clear and unequivocal proof as to warrant the Court in finding that the U.M.W. pursued its policy of uniformity of wage and labor standards by agreement with one or more employers, as distinguis'.ed from pursuing such policy upon its own. The only direct evidence in the record is to the effect that the Union pursued such policy upon its own, and not in agreement with any employer."

265 F.Supp. at 412. The ultimate fact hypothesized—agreement by a union with one employer to impose a particular level of demands on other employers—is precisely the fact relied upon by the *Pennington* court for its finding of nonexemption. Thus we conclude that in reversing *Ramsey* the Supreme Court majority intended to install the preponderance standard as the correct evidentiary yardstick for the nonexemption issue.

members as a lever to directly bring about a default by Embry, or to induce a strike which would bring about a default, and secure the contract again for his company. The union, with knowledge of Ross' purpose, continued to solicit members and traded on what Mr. Ross had said as a basis for seeking 100% membership. Some union members were not advised that their union had been recognized as bargaining agent and were unaware of the agreement for interim benefits. With respect to the members who knew what had happened and was happening, it is almost certain that some of them knew from presence at Mr. Ross' speeches that he was concealing the facts from nonmembers, and even affirmatively misrepresenting, when he stated that he had "heard" a union was organizing and urged them to join. The numerous persons receiving and signing applications for employment with Ross (including persons under contract with Embry), with salary and date left blank on each form, necessarily included union members.

The union characterizes its sole purpose as one of benefitting its members by better pay and working conditions, and considers that to the extent Embry would be injured the injury was a permissible one. Legitimate enjoyment by a union of the manna falling from economic rivalry between employers, and even union whipsawing of an existent employer and its upcoming successor, must be distinguished from acting as catspaw in a concerted purpose to destroy a competitor employer to the benefit of a favored employer. Under the special facts of this case the existence of a concerted purpose was peculiarly plausible. In the usual situation union self-interest militates against driving one of several competitors out of business, for such an action involves a tradeoff between wage levels and number of jobs. But in this case the number of jobs remained substantially the same since the same work force was expected to take over for the successor company.

3. Liability.

In this case, see Justice Douglas's dissent in *Ramsey, supra,* 401 U.S. at 314, 91 S.Ct. 658, 28 L.Ed.2d at 73, the evidence supporting the nonexemption verdict also was sufficient to support the finding of a Sherman One violation.

4. Treble damages instruction.

The District Court properly refused to inform the jury that any award of damages would be trebled. Pollock & Riley, Inc., v. Pearl Brewing Co., 498 F.2d 1240 (CA5 1974).

Affirmed.