31 F.3d 800
 146 L.R.R.M. (BNA) 2961, 128 Lab.Cas. P 11,147,
1994-1 Trade Cases P 70,647
 USS-POSCO INDUSTRIES, a California general partnership, Plaintiff,
and
BE&K Construction Company, a Delaware corporation, Plaintiff-Appellant,
v.
CONTRA COSTA COUNTY BUILDING & CONSTRUCTION TRADES COUNCIL,
AFL-CIO, a voluntary, unincorporated association;
Steamfitters Local Union No. 342 of the United Association
of Journeymen & Apprentices of the Plumbing & Pipefitting
Industry of the United States and Canada, AFL-CIO,
Defendants-Appellees.
 No. 92-15497
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted August 12, 1993.
Decided July 26, 1994.
 
 James G. Gilliland, Jr., Ann Julius, Khourie, Crew & Jaeger, June D. Beltran, Townsend and Townsend and Crew, San Francisco, CA, for plaintiff-appellant BE & K Const. Co.
 Peter D. Nussbaum, Fred H. Altshuler, Altshuler, Berzon, Nussbaum, Berzon & Rubin, San Francisco, CA, for defendant-appellee Steamfitters Local Union No. 342 of the United Association of Journeymen & Apprentices of the Plumbing & Pipefitting Industries of the U.S. and Canada, AFL-CIO.
 Sandra Rae Benson, Victor J. Van Bourg, Van Bourg, Weinberg, Roger & Rosenfeld, San Francisco, CA, for defendant-appellee Contra Costa County Bldg. & Const. Trades Council, AFL-CIO.
 Appeal from the United States District Court for the Northern District of California.
 Before: KOZINSKI, THOMPSON and NELSON, Circuit Judges.
 KOZINSKI, Circuit Judge.
 
 
 1
 We explore the nether reaches of two areas of antitrust law: the statutory labor exemption and the Noerr-Pennington doctrine.I
 
 
 2
 USS-POSCO Industries (UPI) is a joint venture between USX Corporation (formerly U.S. Steel) and Pohang Iron and Steel Co. of South Korea, formed to modernize and operate an old steel facility in Pittsburg, California (PITCAL). Interested unions allegedly attempted to coerce UPI into awarding the general contract to a unionized contractor. After bidding, UPI nevertheless awarded the $350 million construction contract--involving over 800 jobs--to appellant BE & K, a merit-shop contractor. See Henry Weinstein, Workers Are Steeling Themselves to Fight Non-Union Upgrading of Pittsburg Plant, L.A. Times, Mar. 16, 1987, at 3.
 
 
 3
 BE & K alleges the unions then began a campaign to eliminate non-union construction in Northern California by making an example of PITCAL. Although none of the unions had a collective bargaining agreement with BE & K, defendants allegedly filed automatic protests to BE & K's permits in order to cause it gratuitous expense and delay; lobbied for a local toxic waste disposal ordinance that would require BE & K to obtain more permits; sued to enforce the ordinance at the PITCAL site; encouraged BE & K's subcontractors to protest nonexistent safety violations; brought suit against BE & K for allegedly violating environmental laws (the Piledrivers suit); and brought numerous grievances, arbitrations and enforcement proceedings against BE & K's partner, Eichleay Constructors, Inc. (the Eichleay actions). According to BE & K, the unions' purpose was not to organize BE & K's employees, but to cause such delay and expense that future project owners would only hire unionized contractors and subcontractors.
 
 
 4
 UPI and BE & K originally brought suit alleging unfair labor practices under the LMRA, and the unions defended on the ground that their lobbying efforts, the Piledrivers suit and the Eichleay actions were immunized from LMRA liability under the Noerr-Pennington doctrine. See Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983) (applying Noerr-Pennington to labor context); see also Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 144, 81 S.Ct. 523, 533, 5 L.Ed.2d 464 (1961) (legitimate petitioning of government immunized from antitrust laws). Rejecting BE & K's argument that the suits fell within the sham exception to Noerr-Pennington, the district court found that the lobbying of state and local bodies and the Eichleay actions were valid attempts to petition the government. After discovery, the court granted partial summary judgment for the unions. ER 199.
 
 
 5
 BE & K filed an amended complaint which realleged the above-described conduct, this time claiming that it violated the Sherman and Clayton Antitrust Acts.[1] The court granted the unions' subsequent motion to dismiss on the ground that the amended complaint was foreclosed by the prior partial summary judgment. BE & K then filed its second amended complaint, basing it in part on the same activities the district court had ruled were protected by Noerr-Pennington. The court granted the unions' motion to strike those portions of the complaint dealing with the toxic waste ordinance, the Piledrivers suit and the Eichleay grievances. It also imposed Rule 11 sanctions on BE & K. ER 235 at 8-10.
 
 
 6
 The unions then advised the district court they intended to seek partial summary judgment on the antitrust claim on the ground that the surviving allegations involved activities protected by the statutory labor exemption. The court ruled that, in order to overcome the statutory exemption, BE & K would have to prove "both a combination with non-labor groups and an illegitimate purpose in such combination." ER 283 at 8 (emphasis added). The court then limited BE & K's discovery to the first of these elements. Because BE & K was unable to show a triable issue of fact as to whether there was a combination with non-labor groups, the court granted the unions' subsequent motion for partial summary judgment.
 
 
 7
 BE & K stipulated to dismissal of its remaining claims with prejudice. It appeals only the antitrust claims and the imposition of sanctions.
 
 II
 
 8
 In United States v. Hutcheson, 312 U.S. 219, 232, 61 S.Ct. 463, 466, 85 L.Ed. 788 (1941), the Supreme Court examined the "interlacing" Sherman, Clayton and Norris-LaGuardia Acts, and held that they gave unions a statutory exemption to the antitrust laws:[2]
 
 
 9
 So long as a union acts in its self-interest and does not combine with non-labor groups, the licit and the illicit ... are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means.
 
 
 10
 Hutcheson, 312 U.S. at 232, 61 S.Ct. at 466 (emphasis added). This passage has been read as establishing a two-prong test for the statutory labor exemption: (1) Did the union combine with a non-labor group? (2) Did the union act in its legitimate self-interest? See, e.g., United Mine Workers of America v. Pennington, 381 U.S. 657, 662, 85 S.Ct. 1585, 1589, 14 L.Ed.2d 626 (1965); Allen Bradley Co. v. Local No. 3, IBEW, 325 U.S. 797, 806-07, 65 S.Ct. 1533, 1538-39, 89 L.Ed. 1939 (1945); Bodine Produce, Inc. v. United Farm Workers Org. Comm., 494 F.2d 541, 557-58 (9th Cir.1974). A key question in this case is whether these two prongs of Hutcheson are to be read in the conjunctive (i.e., that plaintiff must establish both elements in order to get around the exemption), or in the disjunctive (i.e., that plaintiff can bypass the exemption by proving either element).
 
 
 11
 The district court read the Hutcheson test in the conjunctive and granted summary judgment on the antitrust claim because BE & K was unable to establish a triable issue of fact as to the first element--whether the unions had combined with non-labor groups. BE & K appeals this ruling, arguing first, that the district court defined non-labor group too narrowly; and second, that BE & K should have been allowed to show the union acted for an improper purpose, as an alternative avenue for defeating the statutory labor exemption.[3]
 
 
 12
 A. What constitutes a non-labor group for purposes of the antitrust laws has never been very clearly defined.[4] It is possible, however, to derive a fair approximation of what the term means based on certain common-sense observations.
 
 
 13
 On the one hand, when a labor union combines with an entity that is competing in the plaintiff's market, this normally is deemed to be a combination with a non-labor group, stripping the union of the statutory labor exemption. But see n. 5 infra. Thus, in most statutory labor exemption cases, the focus has been on whether the union combined with a competitor of the targeted employer. See, e.g., H.A. Artists, 451 U.S. at 715, 101 S.Ct. at 2109 (discussing nonlabor group as "one or more employers"); Federal Maritime Comm'n v. Pacific Maritime Ass'n, 435 U.S. 40, 51 n. 15, 98 S.Ct. 927, 934 n. 15, 55 L.Ed.2d 96 (1978) (considering whether there is "combination with nonlabor groups, i.e., whether there is no conspiracy with management"); Pennington, 381 U.S. at 665-66, 85 S.Ct. at 1590-91 (union forfeited statutory exemption where it "agree[s] with one set of employers" to eliminate competition from the industry); Allen Bradley, 325 U.S. at 811, 65 S.Ct. at 1540 ("Congress evidently concluded ... that the chief objective of Anti-trust legislation, preservation of business competition, could be accomplished by applying the legislation primarily only to those business groups which are directly interested in destroying competition."); Bodine, 494 F.2d at 560 ("alliance between the defendant union and non-labor business groups engaged in competition with the plaintiffs" constituted combination with non-labor group); see also Phillip Areeda & Donald F. Turner, Antitrust Law p 229e (1978).
 
 
 14
 At the other end of the spectrum, labor unions carrying out their normal functions must be free to hire law firms, contract for lease space and negotiate with other business entities, without risking antitrust liability. Even though many of the entities that unions deal with on a daily basis cannot fairly be described as labor groups, they are not deemed "non-labor groups" for purposes of the statutory labor exemption. Were it otherwise, this requirement--which lies at the heart of the test announced by Hutcheson--would be rendered utterly meaningless in the sense that everything unions do would become a combination with a non-labor group and possibly subject to antitrust liability.
 
 
 15
 To allow unions breathing space in carrying out their legitimate functions without giving them free rein to extend their substantial economic power into markets for goods and services other than labor, we conclude that the definition of non-labor group must not stray too far from the paradigm of the union combining with the employer's competitors. To constitute a non-labor group for purposes of the statutory labor exemption, therefore, the entity in question must operate in the same market as the plaintiff to a sufficient degree that it would be capable of committing an antitrust violation against the plaintiff, quite independent of the union's involvement. See R.C. Dick Geothermal Corp. v. Thermogenics, Inc., 890 F.2d 139, 148 (9th Cir.1989) (en banc) ("The requirement that the alleged [antitrust] injury be related to anticompetitive behavior requires, as a corollary, that the injured party be a participant in the same market as the alleged malefactors.") (quoting Bhan v. NME Hospitals, Inc., 772 F.2d 1467, 1470 (9th Cir.1985)); see also Associated Gen. Contractors v. California State Council of Carpenters, 459 U.S. 519, 539, 103 S.Ct. 897, 909, 74 L.Ed.2d 723 (1983); Areeda & Hovenkamp, Antitrust Law at 400 p 334.1b (1993 Supp.).
 
 
 16
 As noted, a competitor of the plaintiff clearly falls within that definition, as would a supplier or purchaser of the plaintiff's goods or services. See, e.g., E.W. French & Sons, Inc. v. General Portland, Inc., 885 F.2d 1392 (9th Cir.1989) (ready-mix concrete supplier bringing antitrust suit against cement producer); Zidell Explorations, Inc. v. Conval Int'l Ltd., 719 F.2d 1465 (9th Cir.1983) (distributor of valves bringing antitrust action against suppliers). Other entities, though more remote, may nevertheless stand in such a relationship to the plaintiff that they are deemed to be operating in the same market. See, e.g., Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988) (antitrust suit by manufacturer against private standard-setting organization); Brown v. Ticor Title Ins. Co., 982 F.2d 386 (9th Cir.1992) (antitrust class action by title insurance consumers against insurers for participation in state-licensed rating bureaus). When the union combines with such an entity, it loses the protections of the antitrust exemption.[5]
 
 
 17
 BE & K took discovery on this issue and, although the initial order seemed to restrict discovery to BE & K's competitors, ER 283 at 14, the court subsequently explained that it did not mean to "cut off any discovery reasonably designed to identify contractors, manufacturers or other commercial entities with whom the defendants may have formed illegal combinations." IBEW SER 304 at 3. This was sufficiently broad to allow BE & K to identify anyone falling under the definition of non-labor group as explicated above, but BE & K has been able to point to no such entity. We therefore agree with the district court that BE & K has failed to raise a material issue of fact as to whether the unions combined with non-labor groups, and therefore did not carry its burden under this prong of the Hutcheson test.
 
 
 18
 B. The district court didn't allow BE & K discovery on the alternate prong of Hutcheson because it took the view that failure as to one prong was fatal to BE & K's case. In its most recent pronouncement on the subject, however, the Supreme Court clearly held that a union that combines only with other labor groups may nonetheless lose the statutory exemption under the second prong of Hutcheson. H.A. Artists & Assocs. v. Actors' Equity Ass'n, 451 U.S. 704, 101 S.Ct. 2102, 68 L.Ed.2d 558 (1981), involved a challenge under the Sherman Act to certain rules of the Actors' Equity Union, including the exaction of a franchising fee from theatrical agents licensed by the union.
 
 
 19
 The Supreme Court first inquired whether there was a combination between the union and any "non-labor groups," or persons who are not "parties to the labor dispute." Id. at 717, 101 S.Ct. at 2110. The Court found that the theatrical agents were not a "non-labor group" for purposes of the statutory exemption. Id. Had this been sufficient to establish the union's entitlement to the labor exemption, the Court could have stopped right there. Instead, it proceeded to evaluate whether the union's activities were undertaken in pursuit of its legitimate self-interest. While it found the union's activity generally exempt because the regulations were "clearly designed to promote the union's legitimate self-interest," id. at 721, 101 S.Ct. at 2112, it found "the fees that [the union] levie[d] upon the agents" might not be "a permissible component of the exempt regulatory system," id. at 722, 101 S.Ct. at 2112. Because no evidence had been presented at trial "to show that the costs justified the fees actually levied," id. at 712, 101 S.Ct. at 2107, the case was remanded for further factfinding.
 
 
 20
 Had the Court in H.A. Artists eventually approved all aspects of the arrangement between the union and the agents, its examination of the fee structure might have been explainable on a belt-and-suspenders rationale. But the Court found fault with the fee structure--or at least found that there might be fault. Since H.A. Artists was an antitrust case, the only possible fault could be a violation of the antitrust laws. We read this as a clear holding that a union may violate the antitrust laws--in other words, that it may lose the benefit of the labor exemption--even when it does not combine with a non-labor group. Although, prior to H.A. Artists, there was some doubt on this point,[6] there no longer is. See Daralyn J. Durie & Mark A. Lemley, The Antitrust Liability of Labor Unions for Anticompetitive Litigation, 80 Cal.L.Rev. 757, 783 & n. 155 (1992).
 
 
 21
 What, then, does it mean for a union to pursue an illegitimate purpose? In the broadest sense, everything a union does serves its self-interest. But Hutcheson requires that it act in pursuit of its legitimate self-interest. Whether the interest in question is legitimate depends on whether the ends to be achieved are among the traditional objectives of labor organizations. Thus, if a union forces employers to funnel money into a commercial enterprise from which the union derives profits; or if it forces the employer to hire the union president's spouse; or if a union is involved in illegal activities unrelated to its mission, such as dealing drugs or gambling, those would not be objectives falling within the union's legitimate interest. In such cases, the unions "cease to act as labor groups." Jacksonville Bulk Terminals, 457 U.S. at 714, 102 S.Ct. at 2681.
 
 
 22
 Of course, the means employed by the union bear on the degree of scrutiny we will cast on the legitimacy of the union's interest. See Local No. 189, Amalgamated Meat Cutters & Butcher Workmen v. Jewel Tea Co., 381 U.S. 676, 689-90, 85 S.Ct. 1596, 1602, 14 L.Ed.2d 640 (1965) (plurality opinion) (restraints on the product market must be "so intimately related to wages, hours and working conditions that the unions' successful attempt to obtain that provision through bona fide, arm's length bargaining in pursuit of their own labor union policies, and not at the behest of or in combination with nonlabor groups, falls within the protection of the national labor policy and is therefore exempt from the Sherman Act"). Thus, where a union engages in activities normally associated with labor disputes, see, e.g., 29 U.S.C. Sec. 104,[7] these will be presumed to be in pursuit of the union's legitimate interest absent a very strong showing to the contrary. See, e.g., Bodine Produce, 494 F.2d at 557 (group boycott and demands for recognition were "intimately related to wages, hours, and working conditions which ... places it within the protection of national labor policy and exempt from the Sherman Act"). Where the union's activities are farther afield, the scrutiny is more searching. See, e.g., H.A. Artists, 451 U.S. at 722, 101 S.Ct. at 2112 (examining whether franchise fees are sufficiently related to legitimate union ends); Carroll, 391 U.S. at 112, 88 S.Ct. at 1570 ("the price-list requirement is brought within the labor exemption under the finding that the requirement is necessary to assure that scale wages will be paid to the sidemen and the leader").
 
 
 23
 H.A. Artists casts a highly instructive light on this issue. The activity there--collection of franchise fees from the agents for the direct benefit of union members--was not a traditional union activity; it looked like the union may have been using its bargaining power with theatrical agents to generate a collateral source of revenue. The Court did not say the franchise fees violated the antitrust laws per se, but placed a substantial burden on the union to prove why this method of collecting revenues was not merely convenient but necessary. "[W]ithout the fees ...," the Court reasoned, "the dues of [the union's] members would perhaps have to be increased to offset the loss of a general revenue source," but there was "no reason to believe that any of its legitimate interests would be affected." 451 U.S. at 722, 101 S.Ct. at 2112. The Court's concern thus seemed to be that the union may have funneled the market power granted to it by the labor laws into a money-making enterprise. That the money would then be used to finance labor-related activities was not, in the Court's view, exculpatory, unless the union could show it could not achieve those objectives some other way.
 
 
 24
 Many of the activities of which BE & K complains are traditional organizational activities, closely related to traditional union ends. For example, the unions allegedly "picketed and handbilled the plaintiffs' premises" after BE & K refused to "recognize them as the exclusive collective bargaining representative for the employees of BE & K and its subcontractors, and enter into a collective bargaining agreement with the defendants...." SAC pp 31(e)(i), (iii). And the unions encouraged work stoppages by unionized employees because of well-founded safety concerns at the project site. See Contra Costa SER 3-5, 316-40; 348-52.[8]
 
 
 25
 That these activities were not undertaken to unionize this particular employer but in order to eliminate non-union shops altogether by making an example of BE & K does not matter. See Pennington, 381 U.S. at 666, 85 S.Ct. at 1591 ("a consequence of [legitimate] union activity may be to eliminate competition based on differences in [labor] standards"); Bodine Produce, 494 F.2d at 549 (unions' purpose is "to eliminate competition based on differences in labor standards"). Encouraging the use of unionized labor is an objective well within the legitimate interests of labor unions and, so long as this end is pursued by activities normally associated with labor disputes, there's a strong presumption that the unions are protected from antitrust liability by the statutory labor exemption.
 
 
 26
 More troublesome are certain other activities allegedly undertaken by the unions, such as pressing frivolous lawsuits, automatically protesting against permits sought by BE & K, pressing for the passage of a regulatory measure and then agitating for its enforcement against BE & K--all allegedly to make an example of BE & K and discourage use of merit-shop contractors by parties such as UPI. Taking a cue from H.A. Artists, we cannot say that pursuing legitimate labor goals through this kind of activity is per se exempted from the antitrust laws. See Durie & Lemley, 80 Cal.L.Rev. at 759-62 (using BE & K as case study). The question here, as in H.A. Artists, is whether the non-traditional means were appropriate--in other words, whether the non-traditional means were not only lawful, but necessary because the goals could not be achieved through traditional tactics. And the burden to show this lies with the unions. See H.A. Artists, 451 U.S. at 722, 101 S.Ct. at 2112.
 
 
 27
 Because the district court erroneously construed Hutcheson 's two-part test in the conjunctive, it did not allow discovery on this issue. In this, we conclude, the district court erred. Plaintiff was entitled to try to raise a triable issue of fact on this point by gathering evidence in support of its allegations.
 
 III
 
 28
 That's not the end of the matter, however, because the unions raise another defense. The Noerr-Pennington doctrine provides broad antitrust protection for those who "petition the government for a redress of grievances." City of Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 378, 111 S.Ct. 1344, 1353, 113 L.Ed.2d 382 (1991) (quoting First Amendment). This protection extends to lobbying of government officials, Eastern R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 144, 81 S.Ct. 523, 533, 5 L.Ed.2d 464 (1961), and petitioning of administrative agencies and courts, California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972). In those contexts, immunity from antitrust liability is lost only if a party engages in "sham" petitioning.
 
 
 29
 BE & K argues that the unions engaged in a pattern of "automatic petitioning of governmental bodies ... without regard to and regardless of the merits of said petitions." SAC p 27; see also id. at p 32(a) (alleging that unions filed "a series of overlapping, repetitive and sham lawsuits against plaintiffs, their employees and attorneys ... with or without probable cause and regardless of the merits of the claims asserted therein") (emphasis added); id. at p 30(a) (describing published article by the Business Manager of the Contra Costa Building Trades Council describing a computer system through which "all permits for known non-union contractors would automatically be protested, regardless of size or amount of permit"). BE & K relies on California Motor Transport Co. v. Trucking Unlimited, where the Supreme Court held the allegations "that petitioners 'instituted the proceedings and actions ... with or without probable cause, and regardless of the merits of the cases,' " 404 U.S. at 512, 92 S.Ct. at 612, were "[o]n their face ... within the 'sham' exception," id. at 516, 92 S.Ct. at 614.
 
 
 30
 The unions counter that the Supreme Court's most recent pronouncement on the sham exception forecloses reliance on California Motor Transport. In Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., --- U.S. ----, ----, 113 S.Ct. 1920, 1928, 123 L.Ed.2d 611 (1993), the Court set out a two-part test for sham litigation: First, the suit must be "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits"; second, the baseless lawsuit must conceal " 'an attempt to interfere directly with the business relationships of a competitor.' " Id. --- U.S. at ----, 113 S.Ct. at 1928 (quoting Noerr, 365 U.S. at 144, 81 S.Ct. at 533) (emphasis in original). The two parts of the test operate in succession: Only if the suit is found to be objectively baseless does the court proceed to examine the litigant's subjective intent. Id.; Liberty Lake Investments, Inc. v. Magnuson, 12 F.3d 155 (9th Cir.1993). Under this two-prong test, the unions argue, BE & K must show that each individual suit the unions brought was objectively baseless--a task it abandoned by phrasing the question on appeal as follows: "Whether litigation that is not objectively baseless can still constitute 'sham litigation' sufficient to eliminate ... Noerr-Pennington immunity." BE & K Opening Br. at 1 (emphasis added).
 
 
 31
 We're not persuaded that Professional Real Estate Investors effectively overrules California Motor Transport. Far from criticizing or limiting California Motor Transport, the Professional Real Estate Investors majority cited it with approval. The Court acknowledged that the cases dealt with different questions and noted that "nothing in California Motor Transport retreated from the[ ] principle[ ]" that "unprotected activity [must] lack objective reasonableness ... regardless of intent or purpose." --- U.S. at ---- - ----, 113 S.Ct. at 1926-27.
 
 
 32
 We reconcile these cases by reading them as applying to different situations. Professional Real Estate Investors provides a strict two-step analysis to assess whether a single action constitutes sham petitioning. This inquiry is essentially retrospective: If the suit turns out to have objective merit, the plaintiff can't proceed to inquire into subjective purposes, and the action is perforce not a sham. See --- U.S. at ---- & n. 5, 113 S.Ct. at 1928 & n. 5.
 
 
 33
 California Motor Transport deals with the case where the defendant is accused of bringing a whole series of legal proceedings. Litigation is invariably costly, distracting and time-consuming; having to defend a whole series of such proceedings can inflict a crushing burden on a business. California Motor Transport thus recognized that the filing of a whole series of lawsuits and other legal actions without regard to the merits has far more serious implications than filing a single action, and can serve as a very effective restraint on trade. When dealing with a series of lawsuits, the question is not whether any one of them has merit--some may turn out to, just as a matter of chance--but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival. The inquiry in such cases is prospective: Were the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?
 
 
 34
 The allegations in BE & K's complaint track the language of California Motor Transport and, if proven, would be sufficient to overcome the unions' Noerr-Pennington defense. The record, as developed to date, however, forecloses any possibility that BE & K could substantiate its claim. As noted, the fact that a small number in the series of lawsuits turn out not to be frivolous will not be fatal to a claim under California Motor Transport; even a broken clock is right twice a day. Here, however, fifteen of the twenty-nine lawsuits alleged by BE & K as part of the pattern of filings "without regard to the merits" have proven successful.[9] The fact that more than half of all the actions as to which we know the results turn out to have merit cannot be reconciled with the charge that the unions were filing lawsuits and other actions willy-nilly without regard to success. Given that the plaintiff has the burden in litigation, a batting average exceeding .500 cannot support BE & K's theory. BE & K therefore cannot sustain its burden of showing that the unions' conduct falls within the sham exception to the Noerr-Pennington doctrine.[10]
 
 IV
 
 35
 Finally, BE & K challenges the sanctions awarded against it by the district court because of its persistent reincorporation of stricken parts of the complaint in the amended complaints. The district court found that BE & K "clearly violated the Court's ... Order by repleading causes of action for which summary judgment was granted for defendants." Order of 8/24/89 at 9. BE & K responds that its repleading was required by our decision in London v. Coopers & Lybrand, 644 F.2d 811, 814 (9th Cir.1981), which held that "a plaintiff waives all causes of action alleged in the original complaint which are not alleged in the amended complaint." Accord King v. Atiyeh, 814 F.2d 565, 567 (9th Cir.1987).
 
 
 36
 BE & K's lawyers could find no case applying this rule where the amended complaint was filed after summary judgment rather than after a motion to dismiss. Nonetheless, they claim a good faith belief that they were required to replead the claims on which the court had granted summary judgment in order to preserve them for appeal.
 
 
 37
 We agree with the district court that the London rule only applies to amended complaints that follow upon dismissal with leave to amend, and not to those that follow summary judgment. Nonetheless, we have found no case drawing this distinction. Counsel were not required to risk forfeiting their client's right to appeal in order to avoid sanctions. BE & K's reading of London is not frivolous and, in the absence of authority on point, counsel's decision to err on the side of caution cannot be faulted.
 
 
 38
 * * * * * *
 
 
 39
 We conclude that a union can forfeit the statutory labor exemption even without combining with non-labor groups if the union acts outside its legitimate self-interest. While most of the unions' activities alleged here were protected by the statutory labor exemption, the lawsuits, permit protests and lobbying activities allegedly designed to make an example of BE & K may not have been. The district court therefore erred by precluding discovery into whether these means were intimately related to legitimate union ends. Nonetheless, the error was harmless because these petitioning activities were protected from antitrust liability under the Noerr-Pennington doctrine. We also reverse the award of sanctions against BE & K.
 
 
 40
 AFFIRMED IN PART; REVERSED IN PART.
 
 
 
 [1]
 UPI voluntarily dismissed its complaint against all defendants in February 1990, and is no longer a party to this suit. See Firm, Building Trades, Settle Feud Over Environmental Concerns at Steel Plant, Daily Lab.Rep. (BNA), Mar. 1, 1990, at A-8
 
 
 [2]
 There is also a non-statutory exemption for agreements between unions and employers that are intimately related to the unions' vital concern with wages, hours and working conditions. Connell Construction Co. v. Plumbers & Steamfitters Local No. 100, 421 U.S. 616, 622, 95 S.Ct. 1830, 1835, 44 L.Ed.2d 418 (1975); Richards v. Neilsen Freight Lines, 810 F.2d 898, 905 (9th Cir.1987). As no such collective bargaining relationship existed here, the non-statutory exemption is not at issue
 
 
 [3]
 BE & K also complains that the district court improperly assigned to it the burden of proving that the statutory labor exemption did not apply, since defendants normally bear the burden of proving exceptions to the antitrust laws. See Feather v. UMWA, 711 F.2d 530, 542 (3d Cir.1983); Consolidated Express, Inc. v. New York Shipping Ass'n, 602 F.2d 494, 521 (3d Cir.1979), vacated on other grounds, 448 U.S. 902, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980); 9 Julian O. von Kalinowski, Antitrust Laws and Trade Regulation, Sec. 81.09 (1993). But the statutory exemption is not an affirmative defense; it's an element of any claim that unions violated the antitrust laws. Plaintiff bears the burden of proof. See Pennington, 381 U.S. at 669, 85 S.Ct. at 1592 ("the alleged agreement between UMW and the large operators ..., if proved, was not exempt from the antitrust laws"); Richards, 810 F.2d at 902 ("[f]ailure on the part of the plaintiff to produce evidence from which a jury could infer reasonably that conduct was conspiratorial, not unilateral, will lead to summary judgment for the defendant"); Bodine Produce, 494 F.2d at 561 (plaintiff must specifically allege non-labor group combination); Mid-America Regional Bargaining Ass'n v. Will County Carpenters Dist. Council, 675 F.2d 881, 886 (7th Cir.1982) ("if the defendants' conduct is to fall outside the statutory exemption, the plaintiffs must allege a conspiracy under Allen Bradley "). But see United States Steel Corp. v. Fraternal Ass'n of Steelhaulers, 431 F.2d 1046, 1051 (3d Cir.1970) (union failed to meet burden of proving element of statutory exemption)
 
 
 [4]
 Indeed, the case law is saturated with confusing formulations. See Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n, 457 U.S. 702, 721, 102 S.Ct. 2672, 2684, 73 L.Ed.2d 327 (1982) (labor group depends on "the presence of a job or wage competition or some other economic interrelationship affecting legitimate union interests") (quoting American Federation of Musicians v. Carroll, 391 U.S. 99, 106, 88 S.Ct. 1562, 1567, 20 L.Ed.2d 460 (1968)); H.A. Artists & Assocs. v. Actors' Equity Ass'n, 451 U.S. 704, 717, 101 S.Ct. 2102, 2110, 68 L.Ed.2d 558 (1981) ("nonlabor group" consists of "persons who are not 'parties to a labor dispute' " within the meaning of the Norris-LaGuardia Act) (quoting Hutcheson, 312 U.S. at 232, 61 S.Ct. at 466); Allen Bradley, 325 U.S. at 798, 801, 809, 65 S.Ct. at 1534, 1536, 1539 (union lost statutory exemption where it combined with "employers and manufacturers of goods" to "aid and abet business men to do the precise things which the Act prohibits"; "when [a union participates] with a combination of business men who had complete power to eliminate all competition among themselves and to prevent all competition from others, a situation [is] created not included within the exemptions of the Clayton and Norris-LaGuardia Acts")
 
 
 [5]
 There appears to be at least one exception to this general rule. In some cases, a party that would otherwise meet the definition of a "non-labor group" was considered a "labor group" because of an "economic interrelationship" between that party and the union. See, e.g., Jacksonville Bulk Terminals, 457 U.S. at 721, 102 S.Ct. at 2684 (status as "labor group" depends on "whether there is 'some ... economic interrelationship affecting legitimate union interests' "); Carroll, 391 U.S. at 106, 88 S.Ct. at 1567 ("labor group" characterized by "job or wage competition or some other economic interrelationship affecting legitimate union interests between the union members" and the purported "labor group"); accord H.A. Artists, 451 U.S. at 718, 101 S.Ct. at 2110
 
 
 [6]
 Some cases had suggested that the union must combine with a non-labor group as a predicate for antitrust liability. In Allen Bradley, 325 U.S. at 810, 65 S.Ct. at 1540, the Court explained that whether union activities violated the Sherman Act was "dependent upon whether the union acts alone or in combination with business groups." See, e.g., Hunt v. Crumboch, 325 U.S. 821, 65 S.Ct. 1545, 89 L.Ed. 1954 (1945) (unilateral actions of union to drive petitioner out of business are immune from Sherman Act liability); Embry-Riddle Aeronautical Univ. v. Ross Aviation, Inc., 504 F.2d 896, 903-04 (5th Cir.1974) ("A Union can, without forfeiting the exemption, ... act with a purpose to injure or even eliminate the business of an employer.... What makes the exemption disappear is sufficient proof of a concerted purpose, between the union and a favored employer.") (emphasis in original); Bodine Produce, 494 F.2d at 550 ("Following Hutcheson, the issue became primarily one of whether there existed an improper combination with non-labor groups.")
 Other cases had suggested that illegitimate purpose alone might bring a union outside the statutory exemption. See, e.g., Jacksonville Bulk Terminals, 457 U.S. at 714, 102 S.Ct. at 2681 ("the protections of [the statutory labor exemption] do not extend to labor organizations when they cease to act as labor groups or when they enter into illegal combinations with non-labor groups in restraint of trade") (emphasis added); Allied Int'l, Inc. v. International Longshoremen's Ass'n, 640 F.2d 1368, 1380 & n. 12 (1st Cir.1981) (although ILA didn't conspire with any non-union group, its boycott of Soviet cargo was not immunized by statutory exemption because it didn't relate to "legitimate union interest"), aff'd, 456 U.S. 212, 102 S.Ct. 1656, 72 L.Ed.2d 21 (1982); Bodine, 494 F.2d at 558 (activities of non-labor group combination remain within statutory exemption because union was pursuing own interests).
 
 
 [7]
 Congress has provided special protection for certain traditional union activities in 29 U.S.C. Sec. 104, which, inter alia, prohibits restraining orders or injunctions where persons involved in a labor dispute engage in work stoppage, publicize the existence or facts of their dispute, assemble or organize to promote their interest in the dispute, advise or notify persons of their intent to do any of these acts, or advise, urge, cause or induce without fraud or violence any of these acts
 
 
 [8]
 BE & K also vaguely alleged that there were violent pickets. But violence alone is not sufficient to turn protected conduct like labor picketing into an antitrust violation. See Apex Hosiery Co. v. Leader, 310 U.S. 469, 513, 60 S.Ct. 982, 1002, 84 L.Ed. 1311 (1940); Bodine Produce, 494 F.2d at 559
 
 
 [9]
 The twenty-nine actions are listed in paragraph 32(b) of the Second Amended Complaint. BE & K lists separately seven suits in federal court and eight arbitration actions the unions filed against Eichleay Corporation. All were successful and ultimately enforced by the Third Circuit in Eichleay Corp. v. International Assoc. of Bridge, Structural and Ornamental Iron Workers, 944 F.2d 1047 (1991)
 
 
 [10]
 Before us, the unions have moved for sanctions on the ground that BE & K's continued prosecution of this issue after the Supreme Court decided Professional Real Estate Investors was frivolous. We obviously disagree