**TERMINALIFT LLC, Plaintiff,**

v.

**INTERNATIONAL LONGSHORE AND WAREHOUSE UNION LOCAL 29, Defendant.**

**Case No. 11–CV–1999 W(WVG).**

United States District Court, S.D. California.

Signed Sept. 30, 2013.

Michael E. Avakian, Wimberly, Lawson & Avakian, Washington, DC, Stephen F. Lopez, San Diego, CA, for Plaintiff.

Eleanor Irene Morton, Robert Steven Remar, Emily Maglio, Leonard Carder, LLP, San Francisco, CA, Philip Carl Monrad, Leonard Carder, LLP, Oakland, CA, for Defendant.

## ORDER GRANTING IN PART & DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DOC. 47] AND GRANTING PLAINTIFF'S MOTION TO SUBSTITUTE EXHIBIT I [DOC. 52]

THOMAS J. WHELAN, District Judge.

Pending before the Court is Defendant International Longshore and Warehouse Union Local 29's ("Local 29") motion for partial summary judgment. Plaintiff Terminalift LLC opposes, and has filed a motion to substitute Exhibit I in its opposition.

The Court decides the matters on the papers submitted and without oral argument. *See* Civ. L.R. 7.1(d.1). For the reasons discussed below, the Court **GRANTS IN PART** and **DENIES IN PART** Local 29's motion [Doc. 47], and **GRANTS** Terminalift's motion to substitute [Doc. 52].

## I. BACKGROUND

### A. Relevant actors & the collective bargaining agreement.

The International Longshore and Warehouse Union ("ILWU") is the exclusive collective bargaining representative for all longshore workers, longshore mechanics and marine clerks employed by companies belonging to the Pacific Maritime Association ("PMA"). (*Sundet Dec.* [Doc. 47–7], ¶ 4.) The PMA is a multi-employer collec-

tive bargaining agent for approximately 70 stevedoring, terminal operator and steamship companies operating at approximately 30 ports in California, Oregon and Washington. (*Id.,* ¶ 2)

The ILWU and PMA are parties to a collective bargaining agreement, known as the Pacific Coast Longshore and Clerks' Agreement. The agreement is set forth in two documents covering the terms and conditions of employment for ILWU members employed by PMA member companies in West Coast ports. (*Sundet Dec.,* ¶ 7.) Relevant to this case is the document covering longshore workers, the Pacific Coast Longshore Contract Document (the "Labor Contract"), effective July 1, 2008 to July 1, 2014. (*Labor Contract,* at A‑000001.[1]) The Labor Contract covers, among other items, "the movement of outbound cargo only from the time it enters a dock and comes under the control of any terminal, stevedore, agent or vessel operator covered by this [Labor] Contract [ ] and covers movement of inbound cargo only so long as it is at a dock and under the control of any vessel operator, agent, stevedore, or terminal covered by this" agreement. (*Id.,* ¶ 1.11.)

Defendant Local 29 (the only named defendant in this case) is a local labor union affiliated with the ILWU. (*Sundet Dec.,* ¶ 5.) Local 29 represents longshore workers, longshore mechanics, and marine clerks employed by PMA member companies operating in the Port of San Diego (the "Port"). (*Id.*) SSA Marine is one of the PMA‑member stevedoring companies operating at the Port.[2] (*Id.,* ¶ 3.) Local 29 and SSA Marine are covered by the Labor Contract.

Plaintiff Terminalift is a non‑union cargo handling equipment company operating out of the Port, and other California locations. (*Schmitz Dep.,* 16:4–10.[3]) It owns specialized material‑handling equipment to offload fragile and vibration sensitive heavy cargo for foreign and domestic businesses, such as 70–foot windmill blades.

## B. *Local 29 and SSA Marine's labor dispute.*

■ For years before and through April 2011, Local 29 complained that SSA Marine was violating the Labor Contract by failing to assign to longshore workers the work of unlashing windmill components under SSA Marine's control. (*Dietenhofer Dep.,* 17:9–16, 63:3–5[4]; *Sawyer Dep.,* 41:11–44:5, 92:1–93:2, 93:19–94:20[5]; *Maglio Dec.,* Ex. 29 [Doc. 47–6]; *Pl.'s Resp. Sep. State.* [51–1], No. 36.) Although longshore workers performed this work at other West Coast ports (*Sundet Dec.,* ¶ 18), SSA Marine's position was that the agreement did not cover unlashing windmill components at the Port of San Diego.[6]

1. The Labor Contract is attached to the Lindsay Declaration [Doc. 47–8] as Exhibit A.

2. SSA Marine is not a party to this litigation.

3. Portions of Larry Schmitz's deposition ("Schmitz Dep.") are attached to Maglio's Dec. as Exhibit 30 [Doc. 47–6], and to Terminalift's Opposition as Tab 16 [Doc. 51–5].

4. Portions of Jack Dietenhofer's deposition ("Dietenhofer Dep.") are attached to Maglio's Dec. as Ex. 9 [Doc. 47–3], and to Terminalift's Opposition as Tab 4 [Doc. 51–5].

5. Portions of Frances Sawyer's deposition ("Sawyer Dep.") are attached to Maglio's Dec. as Exhibit 28 [Doc. 47–6], and to Terminalift's Opposition as Tab 15 [Doc. 51–5].

6. Terminalift contends that because it performed the work in San Diego, there is no factual basis for Leal Sundet's testimony that the H‑frame work was performed by longshore workers at other ports. (*See Pl.'s Resp. Sep. State.,* No. 35.) The Court disagrees. Since October 2006, Sundet has been an elected official of the Coast Longshore Division of the ILWU, and member of the Coast

(*Dietenhofer Dep.*, 17:2–6, 63:3–14; *Sawyer Dep.*, 93:15–18.) SSA Marine was able to avoid arbitration with Local 29 over the dispute for years by asserting that section 1.27 of the Labor Contract allowed SSA Marine to assign the work to non-union operators, such as Terminalift. (*Dietenhofer Dep.*, 63:5–8.)

### C. The April 2011 labor protest.

On April 12, 2011, Local 29's President Raymond Leyba, and Vice President and Business Agent Steven Pitre observed Terminalift performing vessel loading work at the Tenth Avenue Marine Terminal ("TAMT") in the Port. (*Leyba Dep.*, 152:14–154:15 [7]; *Pl.'s Resp. Sep. State.*, No. 8.) The work was being performed for SAIC onboard the vessel, the Ocean Pioneer. Leyba believed that Terminalift was using SSA Marine's equipment, and thus SSA Marine was again violating the Labor Contract by not assigning work to longshore workers that was under SSA Marine's jurisdiction or control. (*Id.*, 153:12–13, 182:9–25.)

At approximately 8:00 a.m., Pitre approached the gangway of the Ocean Pioneer and demanded to speak with an SAIC representative. (*Deleeuw Dep.*, 64:18–21.[8]) David Deleeuw, SAIC's Senior Project Manager in charge of the operation, responded. (*Id.*, 65:3–8.) When Deleeuw met Pitre on the dock, Pitre told him to "get in his truck, that [SAIC was] going to hire" the union. (*Id.*, 65:7–14, 66:6–17, 67:4.) Pitre did not threaten Deleeuw, who nevertheless was "a little" concerned for his safety. (*Id.*, 66:21–67:4, 74:17–19, 170:2–16.) The two then drove to SSA Marine's offices at the TAMT.

While at SSA Marine's offices, Pitre demanded that SSA Marine take over Terminalift's work. SSA Marine's logistics coordinator, Frances Sawyer, told Pitre that he should take Deleeuw back to the ship and that they should talk "about this privately." (*Deleeuw Dep.*, 72:5–7.) Sawyer also told Pitre that the union should "not force these guys to do something that they don't have to do." (*Id.*, 72:12–15; *Sawyer Dep.*, 55:13–19.) After the two "went back and forth a couple of times," Pitre drove Deleeuw back to the Ocean Pioneer. (*Id.*, 72:17–18.)

Meanwhile, Local 29 President Leyba decided to call on longshore workers to stage a labor rally. (*Leyba Dep.*, 157:15–17.) Initially, the protest involved approximately 10–15 longshore workers. (*Deleeuw Dep.*, 77:10.) By about 10:00 a.m., there were approximately 30 people involved in the protest (*Id.*, 79:21–80:3, 82:7–9; *Forsythe Dep.*, 18:17–19, 20:16–18 [9]), and by lunchtime there were between 70 and 150 longshore workers contained in a roped-off area approximately 125 feet from the gangway of the Ocean Pioneer. (*Cum-*

Labor Relations Committee, a joint labor-management committee composed of the highest level representatives of the ILWU Coast Longshore Division, and the PMA. (*Sundet Dec.*, ¶ 1.) Sundet also declares to have "personal knowledge of each matter stated" in the declaration. Based on Sundet's position in the ILWU, the Court finds Sundet is qualified to testify that longshore workers perform the windmill H-frame work at the other West Coast ports, and accordingly Terminalift's objection is **OVERRULED.**

7. Portions of Raymond Leyba's deposition ("Leyba Dep.") are attached to Maglio's Dec. as Exhibit 17 [Doc. 47–4], and to Terminalift's Opposition as Tab 9 [Doc. 51–5].

8. Portions of David Deleeuw's deposition ("Deleeuw Dep.") are attached to Maglio's Dec. as Exhibit 7 [Doc. 47–3], and to Terminalift's Opposition as Tab 3 [Doc. 51–5].

9. Portions of John Forsythe's deposition ("Forsythe Dep.") are attached to Maglio's Dec. as Exhibit 11 [Doc. 47–3], and to Terminalift's Opposition as Tab 6 [Doc. 51–5].

*mings Dep.,* 60:19–61:10, 97:16–24, 98:19–21 [10]; *Deleeuw Dep.,* 87:14–88:1; *McKeller Dep.,* 49:23–25, 76:23–25 [11]; *Maglio Dec.,* Ex. 14 [Doc. 47–4] at TL000650.) The picketers yelled and held signs saying "get off our dock," "an injury to one is an injury to all," "ILWU Jurisdiction," and "ILWU Work." (*Pl.'s Exhibits,* Ex. C [Doc. 51–3] at 7:13–14; *Deleeuw Dep.,* 88:10–20.) None of the picketers attempted to cross the rope. (*Cummings Dep.,* 61:25–62:1.)

When the initial group of protestors arrived, one of the longshore workers sat on a reel of cable that was about to be lifted onto the Ocean Pioneer. (*Deleeuw Dep.,* 79:2–4.) Pitre refused Deleeuw's request to ask the man to get off the equipment, which required Terminalift to stop work for safety concerns. (*Id.* 79:7–12, 82:16–22.) Deleeuw then called the TAMT Port Operations and informed them that they "had to stop work because of safety issues with the person there and the concern about the picketers." (*Id.,* 84:1–4.) A Port representative then called the Harbor Police.

Officer Yvette Joyner was the first officer to arrive on the scene. Based on her observations, she understood there was "a dispute going on" but felt "it was something civil" and therefore "approached it as just keeping the peace." (*Joyner Dep.,* 28:9–23.[12]) She observed longshore workers yelling at the men on the ship. (*Id.* 28:17–18, 29:13–2.) She also observed men from the ship yelling back at the longshore workers. (*Id.,* 75:8–11.) Aside from the yelling, Officer Joyner did not witness any

longshore workers threaten any violence, nor did anyone tell her that they witnessed any violence. (*Id.,* 73:4–13.) Two other officers on the scene, Lieutenant John Forsythe and Officer Jared Osselaer, also testified that they did not witness any violence, or anyone threaten any violence. (*Forsythe Dep.,* 30:10–11, 47:11–22, 48:15–17; *Osselaer Dep.,* 28:16–29:2, 30:23–31:2.[13])

At approximately 1:00 p.m., a meeting was set up with representatives from the Port, Local 29, the Ocean Pioneer and SAIC. (*Deleeuw Dep.,* 92:9–94:12.) During the meeting, Leyba stated that the reason for the rally was because Local 29 believed the union's "contractual jurisdiction was being ... violated ... because there was SSA equipment on the job." (*Leyba Dep.,* 181:17–182:14.) Local 29 demanded that SSA Marine use union labor to complete the job. SAIC agreed and hired SSA Marine to complete the work. (*Deleeuw Dep.,* 97:17–22.)

### D. *Resolution of the labor dispute.*

A few weeks after the April 12 labor protest, SSA Marine's Port Manager, Jack Dietenhofer, had a conversation with David Miller, the standing arbitrator for Southern California. According to Dietenhofer, Miller had seen some of Local 29's complaints regarding the assignment of work to Terminalift, and Miller opined that the Labor Contract required SSA Marine to use longshore workers for the windmill unlashing work. (*Dietenhofer Dep.,* 16:21–

---

**10.** Portions of Bruce Cummings' deposition ("Cummings Dep.") are attached to Maglio's Dec. as Exhibit 5 [Doc. 47–3], and to Terminalift's Opposition as Tab 2 [Doc. 51–5].

**11.** Portions of David McKeller's deposition ("McKeller Dep.") are attached to Maglio's Dec. as Exhibit 19 [Doc. 47–5], and to Terminalift's Opposition as Tab 10 [Doc. 51–5].

**12.** Portions of Officer Yvette Joyner's deposition ("Joyner Dep.") are attached to Maglio's Dec. as Exhibit 13 [Doc. 47–4], and to Terminalift's Opposition as Tab 7 [Doc. 51–5].

**13.** Portions of Officer Jared Osselaer's deposition ("Osselaer Dep.") are attached to Maglio's Dec. as Exhibit 25 [Doc. 47–6], and to Terminalift's Opposition as Tab 12 [Doc. 515].

17:16, 44:2–17, 57:11–58:15). Although Dietenhofer disagreed with Miller's interpretation of the Labor Contract, he agreed to settle Local 29's grievances by making lost-work-opportunity payments to longshore workers. (*Id.*, 60:25–62:8)

Following his discussion with the area arbitrator, Dietenhofer notified SSA Marine's Vice President for Marketing and Sales, William Fitz, that while "cargo was under our control at the terminal" SSA Marine was required to "perform stripping of H-frames from [the] towers." (*Fitz Dep.*, 26:1–19.[14]) Dietenhofer informed Fitz that "this work and this activity was under the jurisdiction of the longshoremen and that our contract required that we perform that activity." (*Id.*, 27:1–5.) Fitz later notified SSA Marine's windmill customers about the change, and explained that it was needed in order for SSA Marine to comply with "our labor contract." (*Id.*, 29:3–7, 34:3–6.)

### E. *Terminalift files this lawsuit.*

In July 2011, Terminalift filed this lawsuit claiming that it lost the windmill unlashing work because of an antitrust conspiracy, combination or agreement between Local 29 and PMA member companies. After this Court dismissed the First Amended Complaint with leave to amend, Terminalift filed the Second Amended Complaint ("SAC"), which added claims related to the America's Cup Race.

Specifically, Terminalift claims that Local 29 entered into a conspiracy, combination or agreement with the Port to prevent Terminalift from performing work for the America's Cup Yacht Race that was held in San Diego in November 2011. (SAC, ¶ 26.) According to Terminalift, beginning in September 2011, the Port held meetings

to discuss the logistical plan to hold the race. (*Id.*) As a result of the meetings, on October 13, 2011, America's Cup representatives were notified during a meeting with the Port and Local 29 that they were barred from considering Terminalift for cargo loadout and reload, and were to only use union labor for the cargo and stevedoring services. (*Id.*)

Local 29 filed a motion to dismiss certain antitrust claims from the SAC. On May 17, 2013, 2013 WL 2154793, this Court granted Local 29's motion and dismissed (1) Terminalift's first claim for relief for violation of section 2 of the Sherman Act; (2) Terminalift's first claim for relief for violation of section 1 of the Sherman Act to the extent it is based on the April 12, 2011 picketing and loss of windmill customers; and (3) Terminalift's third claim for relief in its entirety. (*See MTD Order* [Doc. 60], 11:2–16.) Local 29 now seeks summary adjudication of the remaining antitrust claims, and state-law claims.

## II. STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Freeman v. Arpaio,* 125 F.3d 732, 735 (9th Cir.1997). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a

---

**14.** Portions of William Fitz's deposition ("Fitz Dep.") are attached to Maglio's Dec. as Exhibit 10 [Doc. 47–3], and to Terminalift's Opposition as Tab 5 [Doc. 51–5].

verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322–23, 106 S.Ct. 2548. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987).

"The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1030 (9th Cir.2001). Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir.1996) (*citing Richards v. Combined Ins. Co.,* 55 F.3d 247, 251 (7th Cir.1995)).

If the moving party meets its initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Triton Energy Corp. v. Square D Co.,* 68 F.3d 1216, 1221 (9th Cir.1995) (*citing Anderson,* 477 U.S. at 252, 106 S.Ct. 2505) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (*quoting* Fed.R.Civ.P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

### III. *Discussion*

Local 29 argues that Terminalift's antitrust claims (the 1st, 2nd and 3rd claims for relief) involving the loss of windmill clients are barred by the statutory and non-statutory labor exemptions. With respect to the claims based on the America's Cup Race, Local 29 argues that Terminalift did not suffer damages. Finally, Local 29 also argues that Terminalift's state-law claims are preempted by federal law. Terminalift opposes arguing that there are disputed issues of material fact, the law does not support Local 29, or Local 29's evidence is not admissible.

Because the record establishes that Local 29 acted unilaterally in the April 12 protest, and there is no evidence that Local 29 was involved in SSA Marines's communications with the windmill clients, the Court finds the claims are barred by the statutory exemption. Alternatively, assuming resolution of the labor dispute constitutes a combination or agreement under the antitrust laws, the Court finds Local 29's conduct is protected by the non-statu-

tory exemption. Accordingly, Local 29 is entitled to summary adjudication with respect to Terminalift's claims based on the April 12 labor protest, SSA Marines communications with its windmill customers and Terminalift's loss of work from its windmill clients.[15]

However, with respect to Terminalift's claim arising from the America's Cup race, there exists a disputed issue of fact regarding whether the event organizers ever considered using Terminalift to position cargo on the docks. For this reason, summary adjudication relating to this claim is not warranted.

Finally, because the evidence establishes that Local 29 did not engage in any violence or threats to public order, Terminalift's state-law claims are preempted by federal law. Accordingly, Local 29 is also entitled to summary adjudication of Terminalift's state-law claims and remedies.

### A. *The Statutory Labor Exemption.*

██ Local 29 argues that Terminalift's antitrust claims (the 1st, 2nd and 3rd claims for relief) are barred by the statutory labor exemption. The statutory exemption shields unions from antitrust liability where (1) the union acts in its owns self-interest, and (2) does not combine with a non-labor group. *USS–POSCO Industries v. Contra Costa County Building & Construction Trades Council, AFL–CIO,* 31 F.3d 800, 805 (9th Cir.1994). As long as the union acts unilaterally and in its own self interest, the exemption applies regardless of "the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end which the particular union activities are the means." *U.S. v. Hutcheson,* 312 U.S. 219, 232, 61 S.Ct. 463, 85 L.Ed. 788 (1941). "Of course, the

means employed by the union bear on the degree of scrutiny we will cast on the legitimacy of the union's interest." *USS–POSCO,* 31 F.3d at 808. "Thus, where the union engages in activities normally associated with labor disputes, see, e.g., 29 U.S.C. § 104, these will be presumed to be in pursuit of the union's legitimate interest absent a very strong showing to the contrary." *Id.* Union activities such as picketing, hand-billing, and encouraging work stoppages at a non-union employer are traditional organizational activities. *Id.,* at 805.

Here, the undisputed evidence establishes that Local 29's labor protest was part of a longstanding labor dispute and that Local 29 acted unilaterally in staging the April 12 picket. The evidence further confirms that SSA Marine's communications with its windmill customers was necessary because it decided to settle the labor dispute with Local 29, and that SSA Marine acted unilaterally in deciding and then communicating to its clients about the resolution of the dispute. For these reasons, the statutory exemption applies.

### 1. *The evidence establishes that the April picketing was part of a long-standing labor dispute between Local 29 and SSA Marine, and that Local 29 acted unilaterally.*

██ The evidence establishes that before and through April 2011, Local 29 repeatedly complained that SSA Marine was violating the Labor Contract by failing to assign to longshore workers the work of unlashing windmill components under SSA Marine's control. (*Dietenhofer Dep.,* 17:9–16, 63:3–5; *Sawyer Dep.,* 41:11–44:5, 92:1–93:2, 93:19–94:20; *Maglio Dec.,* Ex. 29.) Terminalift does not deny this fact or that

---

**15.** Notwithstanding this Court's May 17, 2013 order dismissing certain antitrust claims for failure to state a claim, for the reasons stated herein, the dismissed claims are also barred by the labor exemptions.

the dispute predated the April 2011 picket. (*See Pl.'s Resp. Sep. State.*, No. 36.)

The evidence also establishes that on the morning of April 12, Local 29's President and Business Agent believed Terminalift's workers were using SSA equipment to unload cargo from the Ocean Pioneer. (*Leyba Dep.*, 153:12–13, 182:9–25.) As a result, Local 29 organized its members to picket SSA Marine's perceived violation of the Labor Contract. (*Id.*, 153:25–14, 157:15–17, 182:9–25.) Local 29's statements at the meeting held that afternoon confirm that the protest was in response to Local 29's belief that SSA Marine was again violating the Labor Contract. (*See Leyba Dep.*, 181:23–182:19; 183:9–185:5; *Deleeuw Dep.*, 95:9–21.) These undisputed facts further demonstrate that Local 29's goal was to have its members perform work that Local 29 believed longshore workers were entitled to perform under the Labor Contract. Indeed, there is no dispute that at the conclusion of the meeting, SAIC hired longshore workers to complete the job. (*Deleeuw Dep.*, 97:17–22.)

Terminalift nevertheless disputes Local 29's contention that there is no evidence that "PMA, SSA, or any PMA member company played any role in planning orchestrating, or supporting the labor activity on April 12, 2011." (*See Def.'s Resp. Sep. State.*, No. 20.) However, Terminalift cites no evidence remotely suggesting that any PMA member was involved in the labor protest. Instead, Terminalift's claimed dispute is based on the contention that "SSA knew what the [sic] Local 29 was attempting to achieve with SAIC on April 12, 201[1]." (*Id.*) The argument lacks merit.

SSA Marine's purported knowledge about what Local 29 was attempting to achieve during the April 12 labor protest is simply not evidence that SSA Marine participated or was involved in the protest.

By Terminalift's logic, anyone witnessing the protest, such as the Harbor police or Terminalift itself, was "involved" in the protest. Moreover, there is no evidence contradicting SSA Marine's Port Manager's testimony that SSA Marine was not involved in the protest. (*Dietenhofer Dep.*, 63:21–24.) And Terminalift recognizes that SSA Marine's representatives at the TAMT on April 12 did not agree with Local 29's effort to have SAIC hire longshore workers to complete the job. (*See Pl.'s Opp.*, 2:5–9 (citing *Deleeuw Dep.*, 72:12–15 and *Sawyer Dep.*, 55:13–19).) Thus, Terminalift failed to raise a disputed issue of fact that Local 29 acted unilaterally.

Based on this evidence, the Court finds that the April 12 labor protest constituted unilateral conduct by Local 29, in furtherance of its self-interests of obtaining work for its members. *See USS–POSCO*, 31 F.3d at 809 ("Encouraging the use of unionized labor is an objective well within the legitimate interests of labor unions and, so long as this end is pursued by activities normally associated with labor disputes, there's a strong presumption that the unions are protected from antitrust liability by the statutory labor exemption.") Additionally, there is no dispute that Local 29's labor protest consisted of conduct typically used by unions to achieve their goals. *See Id.*, 31 F.3d at 809 (recognizing picketing as a traditional organizational activity). Accordingly, the Court finds Local 29's April 12 labor protest is protected from antitrust liability by the statutory-labor exemption.

**2. *There is no evidence that Local 29 was involved in SSA Marine's communications with its windmill customers.***

Although Terminalift argues that SSA Marine's communications with its windmill customers was part of a combina-

tion or agreement with Local 29, there is no evidence remotely suggesting that Local 29 was involved. Terminalift fails to cite any supporting evidence, and the Court has found nothing in the record suggesting that Local 29 asked, demanded or in any way participated in SSA Marine's communications with its windmill customers.

The evidence establishes that SSA Marine's Vice President for Marketing and Sales, Fitz, informed the customers that SSA Marine was required to perform the windmill unlashing work in order to comply with the Labor Contract. (*Fitz Dep.,* 29:3–7, 34:3–6.) The undisputed evidence also demonstrates that Fitz decided to notify customers because Dietenhofer informed Fitz that SSA Marine needed to comply with the Labor Contract. (*Id.,* 26:1–19, 27:1–5.) Nor is there any dispute that Dietenhofer so informed Fitz after Dietenhofer decided to resolve the labor dispute. (*Dietenhofer Dep.,* 16:21–17:16, 44:2–17, 57:11–58:15.)

Terminalift nevertheless argues that a disputed issue of material fact exists, and suggests that SSA Marine's decision to settle the labor dispute is contrived. Terminalift's argument is not persuasive.

First, Terminalift cites no evidence that even remotely contradicts SSA Marine's decision to settle the labor grievance. In contrast, SSA Marine's decision to make lost-opportunity payments to Local 29 members, and Dietenhofer's uncontradicted testimony is evidence that SSA Marine decided to settle the longstanding labor dispute with Local 29. (*See Dietenhofer Dep.,* 60:25–62:8.)

█ Rather than cite evidence raising a disputed issue of fact, Terminalift objects to Dietenhofer's testimony regarding his conversation with the area arbitrator as hearsay. (*Pl.'s Opp.,* 5:14–15.) However, as Local 29 points out, Dietenhofer's testimony is not offered to prove the matter asserted—i.e., that SSA Marine was violating the Labor Contract. In fact, Dietenhofer testified that he disagreed with Miller's interpretation of the Labor Contract. Instead, the testimony was used to explain why Dietenhofer agreed to finally resolve the longstanding labor dispute, and why Fitz communicated with SSA Marine's windmill customers. The Court, therefore, finds Dietenhofer's testimony admissible and **OVERRULES** Terminalift's objection.

Moreover, there is other evidence in the record that explains why SSA Marine may have agreed to settle the labor dispute. The evidence confirms that the same windmill work that gave rise to Local 29 and SSA Marine's dispute was being performed by longshore workers at other West Coast ports. It is also undisputed that the same Labor Contract covers Local 29's members, SSA Marine, the longshore workers at the other West Coast ports, and the PMA members operating at the other ports. These two facts together suggest that SSA Marine was violating the Labor Contract by failing to use longshore workers at the Port of San Diego to perform the windmill unlashing work. Accordingly, these undisputed facts also explain SSA Marine's decision to settle the labor dispute.

In light of these undisputed facts, the Court finds Local 29 was not involved in SSA Marine's decision to communicate with its windmill customers about the resolution of the labor dispute. Instead, the evidence demonstrates SSA Marine unilaterally decided to resolve the labor dispute and then unilaterally decided to notify its windmill customers. Because there is no evidence supporting Terminalift's claim of a conspiracy, combination or agreement over SSA Marine's communications with

its windmill customers, summary adjudication is appropriate with respect to all of Terminalift's antitrust claims arising from the loss of the windmill customers.

### B. *The Non–Statutory Labor Exemption.*

Local 29 also argues that Terminalift's antitrust claims are barred by the non-statutory labor exemption. To the extent Local 29 and SSA Marine's resolution of the labor dispute constitutes a combination or agreement, Terminalift's claims are barred by the non-statutory labor exemption.

■■■■ The non-statutory exemption applies to agreements or concerted action between unions and employers that address matters like wages, hours, the terms and conditions of employment of workers that the union represents or seeks to represent, or closely related matters. *Connell Constr. Co. v. Plumbers & Steamfitters Local 100*, 421 U.S. 616, 622, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). This exemption applies even if the agreement or combination has an anticompetitive effect. *Id.*

As discussed above, the evidence establishes that SSA Marine decided to perform the windmill unlashing work for its customers in order to resolve the longstanding labor dispute with Local 29 and comply with the Labor Contract. Because the "agreement" to resolve the labor dispute involved the Labor Contract's terms and conditions of the employment for longshore workers, the Court finds the alleged agreement or concerted action is protected by the non-statutory labor exemption.

### C. *A disputed issue of material fact exists regarding Terminalift's damage claim related to the America's Cup Race.*

■■■■ Local 29 seeks summary adjudication of Terminalift's claim arising from the America's Cup Race on the ground that race coordinators never considered subcontracting the work of positioning containers to Terminalift, and thus Terminalift did not suffer damages. (*See Def.'s P & A*, 12:8–13; 22:4–7.) Terminalift opposes by arguing that a disputed issue of material fact exists over whether race organizers considered using Terminalift. (*See Pl.'s Opp.*, 7:10–26, 21:12–22:2.)

There is no dispute that Terminalift's damage claim related to the America's Cup work is limited to repositioning containers. According to Terminalift's initial discovery responses, Terminalift sustained $60,000 in damages related to the America's Cup Race. (*See Pl.'s Rog. Resp.*, No. 9.[16]) This loss is based on "400 containers at $150 ea[ch]." (*Id.*) Terminalift confirmed this damage claim six months later in responding to Local 29's supplemental interrogatory. (*See Pl.'s Supp. Rog. Resp.*, No. 9.[17]) Additionally, Terminalift's person most knowledgeable, Jesse Nelson, testified that this work consisted of taking containers that America's Cup staff offloaded from their vessel, and "position[ing] them in a— in a—in a strategic fashion for the America's Cup Race." (*Nelson Dep.*, 7:1–10, 7:20–25, 21:16–25.[18]) Finally, in responding to Local 29's motion, Terminalift also stated that it is undisputed that its damage claim relating to the America's Cup Race consisted of lost work positioning containers. (*See Def.'s Resp. Sep. State.*, Nos. 43.) Thus, there is no dispute that Terminalift's

---

**16.** *See Maglio Dec.*, Ex. 2 ("Pl.'s Rog. Resp." [Doc. 47–3]).

**17.** *See Maglio Dec.*, Ex. 3 ("*Pl.'s Supp. Rog. Resp.*" [Doc. 47–3]).

**18.** Jesse Nelson's deposition ("Nelson Dep.") is attached to Maglio's Dec. as Exhibit 21 [Doc. 47–6], and Terminalift's Opposition as Tab 11 [Doc. 51–5].

claimed damages consist of positioning containers.[19]

Local 29 next contends that it is undisputed that "the America's Cup Race never even contemplated subcontracting out this work." (Def.'s P & A, 12:11–12.) The record reveals that this is a disputed factual issue.

Local 29 relies on the following testimony by Sharon Cloward, President of the San Diego Port Tenants Association, to establish that the event organizers did not consider Terminalift for the repositioning work:

Q. All right. And so once the cargo was on the dock, was it going to have to be moved or positioned?

A. Yes.

Q. And who was going to do that?

A. I would—I wasn't there for the operations for the RC44, but whatever the template for the RC44, so they had a mixture of hired people as well as they had their own forklifts for the—for the AC—ACWS—America's Cup World Series team. They have some of their own equipment that they have forklifts and stuff and also they were looking at using other people's equipment as well. Because it's a lot of stuff that needed to be done.

Q. So the positioning of the cargo on the dock under the original plan was going to be performed by the America's Cup folks themselves using some of their own equipment and some rented equipment?

A. Yes.

Q. And what was Terminalift going to do?

A. Well, Terminalift was crane operator for this thing. So when they are putting the ships in the water and doing the stuff that—operations with the water, Terminalift was planned for that.

Q. So the unloading of the cargo from the vessel, Terminalift was not going to do that?

A. I don't know that.

Q. Okay.

A. I don't know that. See, I was not involved in the RC44 race. All I know is what we—what we were doing for America's Cup was a template of what was used for RC44. And unfortunately, I was not there for the races for RC44. I didn't get to watch the setup. I just know we referred to the template of RC44, we would be using the same template for the America's Cup. That's the only reason we even thought it would be a great venue to bring that in because it worked so well for RC44.

(*Cloward Dep.*, 122:7–123:18.[20])

Although Cloward stated that Terminalift was planned for putting "ships in the water and doing the . . . operations in the water," she also admits that for the remaining work, the America's Cup was going to use "the template for the RC44 [race,]" that she "was not involved in the RC44 race," and therefore "does not know" if Terminalift was going to be used to provide other services, such as unloading cargo from vessels. Additionally, Terminalift's person most knowledgeable, Nelson, testified that Terminalift positioned cargo for the RC44 race:

---

19. Local 29 objected to Terminalift's attempt to expand its damages related to the America's Cup Race. However, Terminalift's opposition does not appear to rely on any damages other than positioning the containers.

20. Sharon Cloward's deposition ("Cloward Dep.") is attached to Maglio's Dec. as Exhibit 4 [Doc. 47–3], and to Terminalift's Opposition as Tab 1 [Doc. 51–5].

Q. What Terminalift was going to do is position the containers once they were on the dock?

A. Correct. Which is what that scope of work was with the RC 44 races before. And we had already done that work.

(*Nelson Dep.*, 21:1–5.)

Given Cloward's admission that she was not involved in the RC44 race, it is reasonable to infer that Cloward did not know whether Terminalift was also being considered to position the containers on the dock, as Nelson claimed they had done for the RC 44 race. Thus, the Court finds a disputed issue of material fact exists regarding whether the America's Cup Race considered Terminalift to position containers.

### D. *Local 29's alternative argument regarding the America's Cup claim is unclear.*

Local 29 also argues that even if Terminalift sustained damages related to the America's Cup race, the record "provides no additional disputed facts on an anticompetitive course of conduct," and thus summary adjudication is warranted. (*Def.'s P & A*, 21:5–13.) Local 29's argument is not clear.

The evidence suggests that Terminalift performed work for the America's Cup race. Such evidence seems inconsistent with the claim that Local 29 conspired with America's Cup organizers to preclude Terminalift from performing work for the race. Nevertheless, it is unclear whether Local 29's reference to "an anti-competitive course of conduct" is intended to argue: (1) there is no evidence to support the allegations of a combination, conspiracy or agreement involving the America's Cup; (2) a alleged conspiracy to preclude Terminalift from a single event, such as the America's Cup, does not support an antitrust claim; (3) assuming a conspiracy existed, since event organizers considered using Terminalift to perform work, there was no act in furtherance of the conspiracy; or (4) some other issue. Because Local 29's argument is not clear, Local 29 is not entitled to summary adjudication.

### E. *Terminalift's state-law claims (claims VII, VIII and IX) and state-law remedies are preempted.*

Local 29 argues that Terminalift's state-law claims are barred under section 303 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 187. (*Def.'s P & A*, 22:10–19.) Terminalift opposes, relying on the exception to section 303's preemption, which allows states to regulate statements or conduct involving violence or imminent threats to public order. (*See Pl.'s Opp.*, 22:4–23:15.)

State-law claims arising from a labor dispute are generally preempted by section 303 of the LMRA. *See San Diego Building Trades Council, Millmen's Union, Local 2020 v. J.S. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959); *San Antonio Community Hospital v. Southern California District Council of Carpenters*, 125 F.3d 1230, 1235 (9th Cir. 1997) (recognizing that "interference with prospective economic advantage and contractual rights claims are preempted by section 303 of the LMRA.") "States may, however, regulate secondary activity, that is marked by 'violence and imminent threats to the public order.'" *BE & K Construction Co. v. United Brotherhood of Carpenters and Joiners of America, AFL–CIO*, 90 F.3d 1318, 1328 (8th Cir.1996) (quoting *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 721, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)).

As discussed above, the April 12 labor protest and SSA Marine's subsequent communications with its windmill customers

was done in furtherance of a longstanding labor dispute between Local 29 and SSA Marine. Because Terminalift's state-law claims arise from the same conduct, the claims are preempted unless Local 29 engaged in violence or imminent threats to public order. Neither Terminalift's cited evidence or cases support such an inference.

**1. *There is no evidence that Local 29 engaged in violence or imminent threats to public order.***

Terminalift argues "evidence of fear and violence and threats are material facts here." (*Pl.'s Opp.*, 23:8.) This argument is not supported by the record and rests largely on misleading citations to witness testimony.

Terminalift alleges that at "9:00 a.m., the Union began to engage in a variety of picketing, mass action, threats, coercive conduct and trespasses on equipment owned by SAIC to prevent its movement, just a 'few fee off the gangway.'" (*Pl.'s Opp.*, 2:10–13.) In support, Terminalift cites SAIC's representative David Deleeuw's deposition at page 77, line 16. The cited testimony, however, confirms only that at approximately 9:00 a.m., Deleeuw observed Local 29's Vice President Pitre with 10 to 15 picketers "a few feet off of the gangway" of the ship. (*Deleeuw Dep.*, 77:16.) In fact, Deleeuw stated that at that time, the picketers were not saying anything, and were simply moving around in a circle. (*Id.*, 77:17–78:21.) His testimony does not support an inference of violence, threats of violence or an attempt to block ingress or egress to the vessel.

Terminalift also cites testimony from the Harbor police to support the inference of violence or threats of violence. For example, Terminalift cites Officer Joyner's deposition for the proposition that officers reported that the longshoremen "were surrounding the vessel." (*Def.'s Opp.*, 2:26.)

While Officer Joyner made that statement, Terminalift takes it out of context. Officer Joyner used the phrase to convey the idea that she was able to easily find the location of the labor protest because of the "people surrounding the vessel." (*Joyner Dep.*, 19:9–14.) In context, it is clear that she was not suggesting that longshore workers had surrounded the Ocean Pioneer, which was docked in the water.

Terminalift also claims that Officer Joyner reported the longshoremen "showed 'aggressive behavior' and were 'hostile.'" (*Pl.'s Opp.*, 3:12.) Again, Terminalift takes the comment out of context. Although Officer Joyner testified that the two groups were "hostile" toward each other, she clarified what she meant:

Q. ... You indicated there you saw people being hostile to each other.

A. When I say "hostile," I mean aggressive behavior. They were yelling.

Q. Okay.

A. They were—passive aggressive.

Q. Okay.

A. Passive aggressive. Passive aggressive. Yelling, not quite—they weren't approaching each other. They were passive aggressive. They were doing a sit-out.

(*Id.*, 29:13–21.) She also confirmed that the yelling was also coming from the men on the ship, and was not simply from the longshore workers:

Q. Did anyone on the vessel yell back?

A. Yes.

Q. So the yelling was going in both directions?

A. Yes.

(*Id.*, 75:8–11.) In describing Local 29's conduct in the afternoon, when the largest number of protestors were present, Officer Joyner also stated: "Some of them were eating. I think there was a roach coach

somewhere around. Some people had signs. It was a typical protest." (*Id.*, 45:12–14.) She further testified that the protesters were a safe distance from the vessel. (*Id.*, 74:15–16.) Finally, Officer Joyner testified that she did not witness any longshoremen threaten any violence against any person or property. (*Joyner Dep.*, 73:1–3.) Nor did anyone tell her that they witnessed any longshoremen engage in any acts of violence against any person or property. (*Id.*, 73:4–13.) In fact, Officer Joyner reported to dispatch that she did not want anymore police units to respond because the protest was peaceful. (*Id.*, 57:4–12.)

Terminalift's claim of "violence and threats" is also contradicted by the testimony of the other officers at the scene. Officer Osselaer testified that while people appeared agitated, he did not "remember seeing any" signs that longshoreman were about to become violent. (*Osselaer Dep.*, 19:20–23.) He also testified that he did not witness anyone engage in any acts of violence, anyone threaten any act of violence, or any of the longshoremen board the vessel or physically block ingress or egress to or from the vessel. (*Id.*, 28:16–29:2, 30:23–31:2.) Additionally, no one reported to him that they were fearful for their safety because of the protest, nor did he ever hear from any source that the longshoremen engaged in any acts of violence or threaten acts of violence. (*Id.*, 31:3–10, 31:19–32:1.)

Officer Forsythe, who stated that he had been involved in hundreds of demonstrations over the years, testified that the labor protest was not "out of the ordinary. This is regular stuff." (*Forsythe Dep.*, 30:12–16.) He further testified that he did not recall being concerned about anyone's safety, he did not witness any violence or threats of violence, nor could he recall receiving any reports of violence or threats of violence. (*Id.*, 30:10–11, 47:11–22, 48:15–17.) Far from establishing violence or threats of violence, the police officers' testimony confirms Local 29's contention that the labor protest was non-violent.

Terminalift also points to alleged evidence that SAIC and Terminalift's employees feared for their safety and felt threatened. (*See Pl.'s Opp.*, 3:9–10; Pl.'s Resp. Sep. State., No. 11.) The testimony is not sufficient for two reasons.

■ First, the employees' subjective fear is not evidence of violence or threats of violence. *See BE & K Constr. Co. v. United Bhd. Carpenters*, 90 F.3d 1318, 1328–29 (8th Cir.1996) ("The parties agree that any such threat of violence must have been intended by the speaker, as determined from the statements themselves and the surrounding circumstances.") The Supreme Court has held that "federal law gives a union license to use intemperate, abusive, or insulting language without fear of restraint or penalty if it believes such rhetoric to be an effective means to make its point." *Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers, AFL–CIO v. Austin*, 418 U.S. 264, 283, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) (citing *Linn v. United Plant Guard Workers of America, Local 114*, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966)); *see also BE & K*, 90 F.3d at 1327 (recognizing that federal labor law "has long been characterized by a tolerance for robust union speech."). Thus, while some might understandably feel threatened by the yelling during the labor protest, it does not rise to the level of violence or an imminent threats to public order justifying the application of state law to a labor dispute. This is particularly true where witnesses, such as the Harbor police, all denied witnessing any violence and characterized the protest as typical and peaceful.

Terminalift's argument also exaggerates witness testimony. For example, Terminalift contends that Deleeuw was "concerned for his safety" when he talked to Pitre on the morning of April 12. (*Pl.'s Resp. Sep. State.*, No. 11.) Although Deleeuw testified that he was "a little" concerned when he first talked to Pitre, he suggested that it was because Pitre was "a large person." (*Deleeuw Dep.*, 66:22–67:4.) Additionally, Deleeuw testified that Pitre never used force, and never threatened him with violence or physical force. (*Id.*, 170:2–16.)

Finally, Terminalift also relies on statements by unidentified individuals about "blocking the exit" or "clearing the dock" to suggest that the labor protest involved violence or an imminent threat to public order.[21] Terminalift's reliance on the statements is unavailing for multiple reasons.

First, Terminalift's evidence is hearsay because it consists of out-of-court statements (by unidentified individuals) that Terminalift is attempting to use to establish that Local 29 intended to block an exit or clear the dock. Accordingly, the Court sustains Local 29's objections to the evidence. (*See Reply* [Doc. 53], 3:16–4:5.)

Second, the statements are not attributable to Local 29. A union is not liable for the acts of its members unless it or one of its agents participated in, authorized, or ratified the acts of its members. *See Carbon Fuel Co. v. United Mine Workers of America*, 444 U.S. 212, 216–18, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979); *Simo v. Union of Needletrades, Indus. & Textile Employees, Sw. Dist. Council*, 322 F.3d 602, 620 (9th Cir.2003) (recognizing that the "union's liability for its purported

agents is governed by Norris–LaGuardia Action § 6, 29 U.S.C. § 106[,]" which "requires 'clear proof' of participation, authorization, or ratification before a union can be held liable for the acts of its officers or members."). Here, the statements about clearing the dock and blocking an exit came from an unidentified individual or group of individuals. Because there is no evidence that a Local 29 agent, such as Leyba or Pitre, made, authorized or ratified the statements, they cannot be attributed to Local 29 and do not establish that Local 29 considered blocking an exit or clearing the dock.

Lastly, even if evidence was admissible and could be attributed to Local 29, the evidence establishes, at most, that someone from Local 29 *talked* about clearing the dock or blocking an exit. However, Terminalift has pointed to no evidence that longshore workers ever attempted to clear the dock or block ingress or egress from the vessel. Rather, the evidence remains undisputed that Local 29 never threatened any violence or engaged in violent conduct. For these reasons, the Court finds the evidence supports Local 29's argument that Terminalift's state-law claims and remedies are barred by section 303.

### 2. Terminalift's cases are unavailing.

Terminalift also cites several cases in support of its claim that Local 29's conduct precludes section 303's preemptive force. But Terminalift's cases are not helpful to its argument.

In *Rainbow Tours, Inc. v. Hawaii Joint Council of Teamsters*, 704 F.2d 1443 (9th Cir.1983), the district found that the union engaged in illegal mass picketing because of evidence that the "Union blocked ingress and egress to the [plaintiff's] yard

---

21. Although the Court will **GRANT** Terminalift's motion to substitute Exhibit I [Doc. 52], for the reasons stated herein, the exhibit is inadmissible hearsay and otherwise insufficient to create a disputed issue of material fact.

and threatened those who tried to cross the picket line." *Id.* at 1447. Here, there is no evidence that Local 29 blocked ingress and egress to the vessel or threatened anyone.

In *California State Council of Carpenters v. Associated General Contractors of California, Inc.,* 648 F.2d 527 (9th Cir. 1981), the Ninth Circuit affirmed the dismissal of the state-law claims because the "Supreme Court has adopted a broad rule of federal preemption under the labor laws, requiring preemption not only of laws which might interfere with federally protected activities, but also preempting many state remedies which are basically consistent with the aims of federal labor law." *Id.,* at 540. The Court is at a loss as to why Terminalift cited this case.

In *Adolph Coors Company v. Sickler,* 608 F.Supp. 1417 (C.D.Cal.1985), union representatives made various threats, including that they "could not guarantee the safety of [ ] auction volunteers from acts and conduct of the Defendants." *Id.,* at 1420. In ruling on a motion to dismiss, which required the court to read all inferences in favor of plaintiff, the district court found that because the union's alleged "tortious" acts consisted in part of threats of violence ... under the case law cited, the complaint appears to state an exception to preemption." *Id.,* at 1423. Unlike *Sickler,* Terminalift may not rely on favorable inference based on the complaint's allegations, but instead must produce evidence of violence or threats of violence. Because the record is devoid of any such evidence, the case does not assist Terminalift.

Finally, *Prater v. United Mine Workers of America, Districts 20 and 23,* 793 F.2d 1201 (11th Cir.1986), involved allegations that the union, among other things, damaged plaintiff's equipment, union members "armed with clubs and guns approached" plaintiff's work site and demanded that workers cease mining, and the state highway patrol was required to rescue employees after a violent confrontation. *Id.,* at 1203. The case is therefore easily distinguishable from this case.

In sum, the undisputed evidence establishes that during the April 12 labor protest, Local 29's members carried signs and yelled. Evidence also demonstrates that individuals onboard the Ocean Pioneer yelled back at the longshore workers, and that a few Terminalift and SAIC employees were intimidated by the yelling. There is, however, no evidence that Local 29 blocked ingress or egress to the vessel, threatened violence or committed a violent act. Accordingly, the Court finds Terminalift's state-law claims and remedies are preempted by section 303.

## IV. CONCLUSION & ORDER

For the foregoing reasons, the Court GRANTS Terminalift's motion to substitute Exhibit I [Doc. 52] in its opposition, GRANTS IN PART and DENIES IN PART Local 29's motion for partial summary judgment [Doc. 47] and ORDERS as follows:

1. Terminalift's antitrust claims arising from its alleged loss of windmill customers is barred by the statutory and non-statutory labor exemption.

2. Terminalift's state-law causes of action and remedies are barred by section 303 of the LMRA.

3. A disputed issue of material fact exists regarding whether the America's Cup Race considered using Terminalift to position containers on the dock, and thus Local 29's request for summary-adjudication of the claim is denied.

In light of the foregoing, the Court need not resolve the remaining issues raised in the motion.

**IT IS SO ORDERED.**